**UNITED STATES of America,
Plaintiff,**

v.

**Dan ANDERSON, et al., Defendants.**

Nos. 99–MC–205–JWL,
99–MC–207–JWL.

United States District Court,
D. Kansas.

May 7, 1999.

Tanya J. Treadway, Office of United States Attorney, Kansas City, KS, for United States of America, plaintiff.

Thomas G. Kokoruda, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, John Jenab, Jenab & Kuchar, Olathe, KS, Ankur J Goel, McDermottt, Will & Emery, Washington, DC, for Gina Kaiser, S Craig Holden and David Queen, movants.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This matter comes before the court on a dispute collateral to the complex prosecu-

tion of two doctors, three hospital executives, and two lawyers in an alleged Medicare Kickback scheme. After a nine-week jury trial, the jury convicted the two doctors and two of the hospital executives on conspiracy and other charges.[1]

The dispute now before the court stems from the government's act of naming three other lawyers as "unindicted coconspirators" in various pretrial papers and at trial. Attorney Gina Kaiser, who testified for the government at trial, seeks (1) an order expunging all references to her as an unindicted coconspirator in the Government's Memorandum In Support of Its Motion for Determination of Conflict (Doc. 96), (2) a finding that she was denied her due process rights, and (3) a finding that the government's evidence in this matter proved only that she acted in good faith and not that she was a member of an illegal kickback conspiracy. Attorneys S. Craig Holden and David Queen jointly seek (1) an order expunging from the record all references to them as "coconspirators" or "unindicted coconspirators," and (2) a finding that the proof at trial did not support the government's allegation that they participated in an unlawful conspiracy, but showed instead that they acted appropriately and legally. For the reasons set forth below, the petitioners motions are granted in part and denied in part.

## I. Background

Proper framing of the issues here involved requires a brief procedural history recitation. On June 11, 1997, a federal grand jury indicted Drs. Robert and Ronald LaHue on charges of conspiracy and program fraud pursuant to 18 U.S.C. §§ 371, 666. The indictment alleged that the LaHues had conspired with unnamed coconspirators, both known and unknown to the grand jury. On March 18, 1998, this court dismissed the section 666–related charges on jurisdictional grounds, *see United States v. LaHue*, 998 F.Supp. 1182 (D.Kan.1998), *aff'd*, 170 F.3d 1026 (10th Cir.1999), but not before the LaHues had sought and obtained, under seal, a list of individuals whom the government considered unindicted coconspirators. While pursuing its appeal in the *LaHue* case, the government obtained an indictment against Dan Anderson, Dennis McClatchey, Ronald Keel, Ruth Lehr, Mark Thompson, and the Drs. LaHue on conspiracy and Medicare kickback charges pursuant to 18 U.S.C. § 371 and 42 U.S.C. § 1320a–7b(b).[2] *See, e.g., United States v. Anderson*, No. 98–20030–JWL, 1999 WL 84290 (D.Kan. Jan. 8, 1999). The new indictment, like the dismissed indictment, alleged the existence of unnamed, unindicted coconspirators.

While preparing for trial on the new indictment, the government sought disqualification of trial counsel for Dr. Ronald LaHue and Dr. Robert LaHue because it perceived an unsworn witness problem stemming from the appearance of trial counsel's names on some of the documents it intended to use at trial. The government also asked the court to discern whether any potential conflict arose out of any joint defense agreements or third party fee arrangements. *See United States v. Anderson*, 98–20030–JWL, 1998 WL 713934 (D.Kan. Sept. 28, 1998) (explaining court's findings concerning potential conflicts after individual collogues with each defendant). In its memorandum in support of this motion, the government, for the first time, publicly identified movants Gina Kaiser, S. Craig Holden, and David Queen as unindicted coconspirators. The government's identification of the movants

---

1. The jury acquitted one of the hospital executives. The court acquitted the two lawyer defendants at the close of the government's case. *See United States v. Anderson*, 98–20030–JWL, Tr. at 7336–7352, (D.Kan. Mar. 9, 1999).

2. Although it contained additional defendants and was presented under an alternative statutory theory, the new indictment alleged conduct substantially identical to the conduct alleged in the dismissed indictment.

as coconspirators was notoriously reported in the legal and healthcare community. *See* J. Duncan Moore, Jr., *Baptist Probe Escalates: Unindicted Co-conspirators Named in Kickback Case,* Modern Healthcare, Sept. 7, 1998, at 8; Kip Betz, *Trial Dates Set in LaHue Kickback Case; Motion Names Unindicted Co–Conspirators,* BNA's Health Care Fraud Report, Sept. 23, 1998, at 713; *Healthcare Compliance Gets More Complicated— & More Risky: U.S. Indicts Attorneys in Hospital, Physician Kickback Case,* Washington Insider's Focus, October 9, 1998, at 1; Peter Aronson, *Health Care Fraud Rasies Ire: Three Lawyers Identified as Unindicted Co–Conspirators,* National Law Journal, Nov. 23, 1998, at A01; Janet Novack, *First, Indict All the Lawyers,* Forbes, Jan. 25, 1999, at 62. The government's memorandum did not explain why the government felt compelled to identify the movants publicly as coconspirators. Later, on November 25, 1998 and at the defendants' request, the court ordered the government to provide all defendants with a complete list of unindicted conspirators under seal.[3]

## II. Analysis

### A. Legal Framework

There are no Tenth Circuit cases discussing the propriety of naming unindicted coconspirators. A number of courts, however, have followed the Fifth Circuit's lead in *United States v. Briggs,* 514 F.2d 794 (5th Cir.1975) (striking named unindicted coconspirators from an indictment) and *In re Smith,* 656 F.2d 1101 (5th Cir. 1981) (issuing a writ of mandamus that required district court to seal and strike the name of an unindicted coconspirator from a Rule 11 plea colloquy and related papers). *See* 1 Charles Alan Wright, *Federal Practice and Procedure 3d* § 110, at 464 n. 15 (1999). *Briggs* was a proceeding

collateral to the high-profile prosecution of certain political demonstrators at the 1972 Republican National Convention in Miami, Florida. *Briggs,* 514 F.2d at 796–97. The indictment in *Briggs* named ten coconspirators, seven of whom were indicted and three of whom were not.[4] *Id.* at 797. Two of the unindicted coconspirators sought an order expunging their names from the indictment. *Id.* The trial court denied the motion without comment. *Id.*

On appeal, the Fifth Circuit first determined that the unindicted conspirators' motion was justiciable. *Id.* Standing was appropriate, held the court, because the movants had alleged a concrete injury to their reputations and economic interests from the grand jury's action. *Id.* at 797–98. The court rejected the government's three theories related to standing: (1) that a person's interests are not adversely affected by being publicly branded a felon, (2) that the only injury the movants suffered came at the hands of the news media, and (3) that the acquittal of their alleged coconspirators was sufficient to remedy any injury they incurred. *Id.* at 799. The issues were not moot because the injury to the movants was "real, direct, and continuing." *Id.* at 800.

Moving to the merits of the case, the Fifth Circuit held it was beyond the power of a grand jury to name unindicted coconspirators:

> The grand jury that returns an indictment naming a person as an unindicted conspirator does not perform its shielding function but does exactly the reverse. If the charges are baseless, the named person should not be subjected to public branding, and if supported by probable case he should not be denied a forum.

*Id.* at 803. Naming an unindicted coconspirator in an indictment offends due pro-

---

3. The government's previous disclosure of unindicted coconspirators to the Drs. LaHue had not yet been shared with the new defendants because the new defendants were not yet subject to the court's protective order.

4. All of the indicted defendants were eventually acquitted by a jury. *Id.* at 797.

cess because, when weighing the governmental interest in naming an unindicted coconspirator against the harm to the individual who is accused but not indicted, "the balance tips wholly in favor of the adversely affected appellants." *Id.* at 806.

In *Smith,* the Fifth Circuit extended the *Briggs* rule well beyond the grand jury context, and ordered other court filings and records naming an unindicted coconspirator sealed and struck. *Smith,* 656 F.2d at 1107. *Smith* arose out of bribery allegations concerning the Army and Air Force Exchange Service (AAFES). *Id.* at 1102. The AAFES purchases billions of dollars of merchandise each year for resale to military personnel through the military P.X. system. *Id.* The principal defendants in *Smith* pleaded guilty to a felony information charging one count of bribery of an AAFES purchasing agent. *Id.* at 1103. During the plea hearing, the Assistant United States Attorney read in open court and filed in the case record a factual resume prepared for purposes of the plea hearing. *Id.* "In addition to describing the events immediately involved in (the) plea of guilty, the resume went on to state that [the defendant] had paid sums to other unnamed AAFES employees, but also specifically named the head of AAFES, [Mr. Edward S. Smith,] among those other employees." *Id.* The news media picked up on this information, and reported that, "as a matter of official courtroom record, Mr. Smith had been paid bribe monies by various businesses dealing with AAFES." *Id.* at 1104. Mr. Smith sought relief in the district court, which was denied. *Id.* at 1105. He sought mandamus in the Fifth Circuit. *Id.* Simultaneously, the Commander of AAFES notified Mr. Smith that his retirement benefits would be reduced because of the accusations of wrongdoing. *Id.*

The Fifth Circuit granted mandamus, holding that the plea transcripts and documents must be sealed and stricken, and that they could not be used against Mr. Smith in any administrative benefits proceeding:

> The government in this case urges us to accept the procedures followed regarding the factual resumes to be consistent with *Briggs.* The government argues that *Briggs* only forbids the naming of unindicted coconspirators by a federal grand jury. We cannot agree. The point made in the *Briggs* decision is that no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights. We can think of no reason to distinguish between an official defamation originating from a federal grand jury or an Assistant United States Attorney.

> .    .    .    .    .

> The presumption of innocence, to which every criminal defendant is entitled, was forgotten by the Assistant United States Attorney. . . .

*Id.* at 1106–07.

What *Briggs* and *Smith* teach, then, is that motions like the one here before the court can be justiciable in a proper situation. These cases also teach that, when a motion like this is justiciable, the court must undertake a due process balancing inquiry, balancing the interests of the government in naming unindicted coconspirators against the individual harm that stems from being accused without having a forum in which to obtain vindication.

### B. Justiciability

▇▇▇ The court concludes that the motions here are justiciable; the movants have standing and their claims are not moot. "[I]n order to establish Article III standing, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Department of Commerce v. United States House of Representatives,* 525 U.S. 316, ——, 119 S.Ct. 765, 772, 142 L.Ed.2d 797

(1999) (citing *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Although the movants here do not allege injury of the same magnitude and concreteness as Mr. Smith's lost retirement benefits in *Smith*, they surely suffered injury at least equally as concrete and weighty as the petitioners in *Briggs*. Here, like in *Briggs*, there were numerous press reports affecting the movants' good names and reputations. It is undisputed that the movants here are widely known and highly respected health care lawyers, and the government has not tried to refute their claim that being labeled as criminal coconspirators injured their reputations. Moreover, the relief the movants request would likely redress the injury they continue to suffer. Were the court to expunge all references to the movants as "coconspirators" from the public record, make a finding that their due process rights had been violated, and further find that the government's proof fell far short of proving their criminal culpability, the movants could forevermore proclaim their vindication to anyone expressing concern about the government's allegations. *Cf. Cache Valley Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119, 1124 (10th Cir.1998) (nonminority electrical contractor would have standing to challenge presumption that minority businesses should receive favorable treatment if it could show that elimination of the presumption would "likely" redress its injury by improving the terms of competition it faced). Nor are the movants' claims moot; they have a very real, personal, and ongoing stake in the outcome here. *See Briggs*, 514 F.2d at 800 n. 8 (quoting *Application of Turner and Newall, Ltd.*, 231 F.Supp. 728 (E.D.Pa.1964) ("This case involves the imputation of illegality . . . to the applicant in a document of record, which is not a moot question as far as the applicant is concerned.")).

## C. Due Process

The court believes the movants suffered a violation of due process when the government publicly named them in its moving papers on the conflict of interest issue. Following the lead of *Briggs* and *Smith*, the court weighs the governmental interest in naming the unindicted coconspirators against the individual harm that stems from being accused without having a forum in which to obtain vindication. *See Briggs*, 514 F.2d at 804; *Smith*, 656 F.2d at 1106–07. After carefully reviewing the government's moving papers on the conflict of interest issue, the court can find no reason why the government might have "forgotten" the presumption of innocence in such a public pleading, *see Smith*, 656 F.2d at 1107, which would "rise to the dignity of a substantial interest."[5] *Briggs*, 514 F.2d at 804. The very real stigmatization suffered by the movants from this government action far outweighs the nonexistent government interest in publicly naming them as coconspirators. *See Smith*, 656 F.2d at 1107.[6]

**5.** The government now claims that its identification of unindicted coconspirators was part of an effort to illustrate the admissibility of evidence it intended to offer at trial through which a conflict could arise. *See, e.g.,* Fed. R.Evid. 801(d)(2)(E) (coconspirator hearsay exclusion). Be that as it may, the government provides no explanation for why its moving papers were not submitted under seal. *See Briggs*, 514 F.2d at 805 (public identification of unindicted coconspirators "may be tempered by protective orders. . . .").

**6.** The government argues that the fact Ms. Kaiser entered into a letter immunity agreement and agreed to testify in the government's case in chief allowed the government publicly to identify her as a coconspirator. *See Briggs*, 514 F.2d at 804 n. 16; *Application of Jordan*, 439 F.Supp. 199, 206 n. 7a (D.W.Va.1977). This argument misses the mark because Ms. Kaiser did not agree, as some who testify for the government in criminal trials do, to testify about her own criminal conduct or otherwise admit guilt. To the contrary, Ms. Kaiser did not say anything on the stand that would implicate her in any criminal activity. Surely the government does not mean to imply that an individual who initially invokes her Fifth Amendment right not to speak to the government waives the presumption of innocence by later agreeing merely to accept immunity and testify about her non-criminal acts.

The injuries suffered, at least by Ms. Kaiser and Mr. Holden, were in one sense inevitable because the government had a substantial interest in identifying them at trial as coconspirators. *See Briggs*, 514 F.2d at 805 ("it must be recognized in the process of balancing private injury and governmental interests that wholly different, and valid, governmental interests apply to naming the private citizen ... in trial testimony...."). The government identified at least Ms. Kaiser and Mr. Holden, and perhaps Mr. Queen,[7] as coconspirators at trial, arguing that documents containing their statements under Fed.R.Evid. 801(d)(2)(E) (coconspirator exclusion from the hearsay rule) should be admissible.[8] The government clearly had a substantial interest in identifying these coconspirators for 801(d)(2)(E) purposes. The governmental interest outweighed the movants' private injuries because their private injuries, while important, must yield to the proper administration of criminal justice under these circumstances. *Cf. United States v. Durland*, 575 F.2d 1306, 1310 (10th Cir.1978) (conspiracy charge not a prerequisite to admissibility of declarant's statements under 801(d)(2)(E)). Accordingly, no due process violation resulted from the government's identification of the movants at trial as coconspirators.

The mere fact that the government eventually needed legitimately to let the cat out of the bag at trial, however, does not alter the court's conclusion that the movants' pretrial public identification was a violation of due process because there is an important distinction between being unqualifiedly identified in a pretrial document as an "unindicted coconspirator" and being identified as a coconspirator at trial for purposes of 801(d)(2)(E). Pursuant to the court's rulings, an 801(d)(2)(E) coconspirator is not necessarily a criminal. All that is required is that he or she be a "joint venturer" in a common plan. *See United States v. Layton*, 855 F.2d 1388, 1399 (9th Cir.1988); *United States v. Saimiento–Rozo*, 676 F.2d 146 (5th Cir. 1982); *United States v. Regilio*, 669 F.2d 1169 (7th Cir.1981). In fact, at the government's request, the court found at trial that Ms. Kaiser and Mr. Holden[9] were "coconspirators" for purposes of Rule 801(d)(2)(E) in the sense that they were

> participants of a common plan to put together and facilitate and operate and carry out the relationship between Baptist Medical Center and Blue Valley Medical Group for the continuum of care. They participated in a joint venture, if you will, for the purposes of 801(d)(2)(E). And whether there was a criminal intent on the part of any or all of those individuals is something which ... I need not reach....

Tr. 9624–26.[10] Thus, the government's identification of the movants as 801(d)(2)(E) coconspirators at trial does not allow for the reasonable inference that they are criminals. In contrast to the trial identification, however, the government's unqualified identification of the movants as unindicted coconspirators in its pretrial moving papers allows for the reasonable

---

7. The court does not recall the government having identified Mr. Queen as an unindicted coconspirator at trial, but the court's memory may be foggy on this point. The court does not yet have access to a complete official transcript, and so is unable to confirm its recollection. In any event, because the question makes no difference to the outcome of these motions, the court assumes that the government did identify Mr. Queen as a coconspirator at trial.

8. In many situations, the government's 801(d)(2)(E) proffer was a fallback position in case its 803(6) (business records) arguments were unpersuasive. That the government's position was a fallback position, however, in no way detracts from the legitimacy of its interest in labeling the movants as coconspirators.

9. The court was not asked to make findings at trial concerning Mr. Queen but would have made no more inculpatory findings as to him.

10. The court most assuredly did not make a finding that any of the movants were members of a criminal conspiracy.

inference that they have been labeled criminals. The movants suffered a due process violation.

### D. Remedy

█ It remains for the court to construct a remedy. The requests for relief include: (1) an order expunging all references to Ms. Kaiser as an unindicted coconspirator in the Government's Memorandum In Support of Its Motion for Determination of Conflict, (2) a finding that Ms. Kaiser was denied her due process rights, (3) an order expunging from the record all references to Mr. Holden and Mr. Queen as coconspirators or unindicted coconspirators, and (4) a finding that the government's evidence in this matter proved only that the three movants acted in good faith and not that they were members of an illegal kickback conspiracy. The court grants the first request as to all movants. The court grants the second request in part as to all movants. The court denies the third and fourth requests as to all movants.

All three movants were denied their due process rights in connection with the government's Motion for Determination of Conflict. Accordingly, the court orders the Clerk of the United States District Court for the District of Kansas to seal the Government's Memorandum In Support of Its Motion for Determination of Conflict (Doc.96) in case No. 98–20030–JWL until such time as this order becomes final. When this order becomes final, the clerk shall unseal the document and "completely and permanently strike," see Smith, 656 F.2d at 1107, all references to Ms. Kaiser, Mr. Holden, and Mr. Queen.[11]

The three movants did not suffer a due process deprivation in connection with the government's identification of them as coconspirators for 801(d)(2)(E) purposes at trial. Accordingly, the court denies Mr.

Holden's and Mr. Queen's request to strike all references to them from the case record.

The court also denies the movants' requests to make factual findings related to their innocence. The underlying trial focused on the guilt or innocence of the named defendants and simply was not focused on the movants' guilt or innocence of any crime. Certainly, however, there was no evidence that led this court to believe they were involved in criminal activity. Moreover, the court reiterates some of the findings it made at trial which relate directly to the named lawyer defendants and which bear significantly on the court's views concerning these movants:

> The court is firmly convinced from the evidence presented that the only reasonable inference a jury could draw is that the lawyers, each in their own turn, attempted to advise their clients to engage in legal transactions and that these two Defendants [lawyers Ruth Lehr and Mark Thompson] did not prepare sham agreements to paper over a fraud but, rather, tried their best to prepare agreements that would reflect what they intended to be legal transactions into which their clients desired to enter. The state of the law was in flux; the lawyers adapted their advice to it as it changed.

> The government, in effect, argues that the relationship between Baptist and Blue Valley Medical Group was so tainted by an overarching desire on the part of the Baptist defendants to receive referrals and on the part of the Drs. La-Hue to receive payments for those referrals that illegal remuneration to induce [referrals] was virtually inescapable. The court disagrees. It is undisputed from the evidence that *all* the lawyers who dealt with or reviewed these transactions ... held good faith beliefs that it was *possible* to facilitate some business

---

11. Although Mr. Holden and Mr. Queen did not specifically request this relief, the court grants it because it is firmly convinced it would appropriately remedy the violation of their due process rights.

relationship that was legal between the hospitals and the Blue Valley Medical Group. Even if patient referrals were devoutly hoped for and anticipated; even if the volume of patients could be large; even if the parties might never have come together but for Baptist having embarked on a long range plan that depended on attracting nursing home patients, there is nothing in the evidence or the law that would have a priori precluded a legal relationship from being entered into under these circumstances.

The problem here is that a very simple concept, "payment for patients is illegal," became far from simple as Congress, the Executive Branch, and the Courts got more deeply involved. "Remuneration to induce" language invites judicial interpretation as to what these words mean. Indeed, the government in this case adamantly maintains that the words require definition as part of jury instructions. Judicial catch phrases like "one purpose rule" or "primary purpose rule," the reversals of field by the Office of Inspector General, the checkered history of the *Hanlester* case and the reservation by Congress of a safe harbor provision in the Act, the promulgation of regulations concerning which were delayed for a considerable time, all invite lawyers to attempt to devise legal ways for parties to have a relationship which has as a component hoped-for and anticipated referrals. That's what defendants Lehr and Thompson did under the evidence presented in this case.

There were no decisions from the U.S. Supreme Court or from the Eighth or Tenth Circuits, where the activities in question were going on, to guide them. What the evidence unassailably demonstrated is that they steadfastly maintained to their clients that if fair market value was paid for the doctors' practice or for legitimate consulting services, the relationship passed legal scrutiny. Nothing in the evidence or the law suggests otherwise.

Tr. 7342–45 (emphasis added); *see also* Tr. 2465 ("THE COURT: I'm skeptical. If there's nothing more to tie Mr. Holden to the documents, given what I think the tenor of the documents frankly are that I have seen that Mr. Holden authored, that I'm going to be persuaded that he was involved in a [criminal] conspiracy."); Tr. 4238 ("THE COURT: As I recall, your position was you weren't going to attempt to prove that Mr. Holden was a co-conspirator. MS. TREADWAY: No. Because he's an agent at this point in time."); Tr. 9320–21 ("THE COURT: I've also noted and without being—not intending to be pejorative about it, but the Government has deliberately identified people as coconspirators in this case. Some of the people who testified in this case, who it turns out were identified as coconspirators, frankly, I would certainly be curious to know the rest of the evidence the Government had concerning them that would have caused them to believe these people were involved in criminal activity as opposed to simply folks involved in a business activities [sic], which may or may not in fact have been criminal, but without any knowledge on the part of those individuals. Certainly, a particularized example is the status of Gina Kaiser who came into this as an unindicted coconspirator and Ms. Treadway now seems to be using her as the Government's chief example what an attorney should do by suggesting such things as the contract should have been discontinued."). These transcript excerpts reflect the court's views concerning the evidence at trial better than any post hoc findings ever could. Publication of them here, it is hoped, will help remedy the wrong done by the government to these lawyers by its unnecessary branding of them in its public pretrial papers.[12]

---

12. As of the date of this Memorandum and Order, all proceedings related to the pending motions, including this Memorandum and Order, remain under seal. Accordingly, this Memorandum and Order shall remain under seal until such time as one or more of the

**IT IS THEREFORE ORDERED BY THE COURT** that Ms. Kaiser's Motion to Expunge (Doc. 1, 99–MC–207–JWL), and Mr. Holden's and Mr. Queens' Motion to Expunge (Doc. 2, 99–MC–205–JWL) are granted in part and denied in part. The District Clerk for the District of Kansas shall seal the Government's Memorandum In Support of Its Motion for Determination of Conflict (Doc. 96) in case No. 98–20030–JWL until such time as this order becomes final. When this order becomes final, the Clerk shall completely and permanently strike all references to Ms. Kaiser, Mr. Holden, and Mr. Queen in the Government's Memorandum In Support of Its Motion for Determination of Conflict (Doc. 96) in case No. 98–20030–JWL.

**IT IS FURTHER ORDERED** that this Memorandum and Order shall remain under seal pursuant to the court's April 2, 1999 order (Doc. 1, 99–MC–205–JWL) until such time as one or more parties obtain the court's leave to have it unsealed.

**IT IS SO ORDERED.**

parties seek and obtain the court's leave to have all or part of the proceedings unsealed.