**UNITED STATES of America,
Plaintiff,**

v.

**Dan ANDERSON (01), Robert C. LaHue (03), Ronald H. LaHue (04), Dennis McClatchey (06), Defendants.**

Nos. 98–20030–01–JWL, 98–20030–03–JWL, 98–20030–04–JWL and 98–20030–06–JWL.

United States District Court,
D. Kansas.

July 21, 1999.

Keith E. Drill, Ronald D. Lee, Jacqueline A. Cook, James R. Wyrsch, David A. Kelly, Wyrsch Hobbs Mirakian & Lee, P.C., Kansas City, MO, for Dan Anderson (1), defendant.

Robert J. Campbell, James E. Kelley, Jr, Lewis, Rice & Fingersh, L.C., Kansas City, MO, for Ronald Keel (2), defendant.

Bruce C. Houdek, Kansas City, MO, Robert C LaHue, Stillwell, KS, for Robert C Lahue (3), dba Robert C LaHue, defendants.

Anne M. Brafford, Bryan Cave LLP, Kansas City, MO, James L. Eisenbrandt, Jeffrey D. Morris, Bryan Cave LLP, Overland Park, KS, Ronald H LaHue, Leawood, KS, for Ronald H LaHue (4), defendant.

Thomas E. Carew, Morrison & Hecker L.L.P., Kansas City, MO, Gerald A Feffer, Williams & Connolly, Washington, DC, for Ruth Lehr (5), defendants.

Charles W. German, Scott M. Brinkman, Rouse, Hendricks, German, May & Shank,

Kansas City, MO, for Dennis McClatchey (6), defendants.

Michael D. Strohbehn, Walters, Bender & Strohbehn, Kansas City, MO, R. Stan Mortenson, Barry J. Pollack, Jody M. Kris, Miller, Cassidy, Larroca & Lewis, Washington, DC, for Mark Thompson (7), defendants.

Tanya J. Treadway, Office of United States Attorney, Kansas City, William Bowne, U.S. Department of Justice Fraud Section, Washington, DC, for U.S. Attorneys.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This matter is presently before the court on motions for acquittal, new trial, arrest of judgment, and dismissal (Docs.423, 425, 426, 427, 428, 432) filed by the four defendants who were convicted of various Medicare fraud offenses by a jury following a nine week trial. Also before the court is the defendants' motion to compel production of the lengthy and detailed sentencing memo (Doc. 420) which the government provided ex parte to the District of Kansas probation officers involved in preparing the Pre–Sentence Investigation report in this case. The court has devoted countless hours to consideration of the arguments put forth in the parties' papers. It has carefully considered the factual and legal points addressed and has conducted its own thorough legal research. The questions presented are often difficult to resolve and some are exceedingly close calls. While most of the issues have been raised, litigated and decided by the court previously before and during trial, other matters are ripe for indepth consideration virtually for the first time at this stage of the case. In any event, the court is now prepared to rule.

For the reasons set forth below, the court grants Mr. McClatchey's motion for acquittal and, in the alternative,[1] for a new

---

1. Mr. McClatchey's motion for new trial is granted conditionally pursuant to Fed. R.Crim.P. 29(d) ("If a motion for judgment of acquittal after verdict of guilty ... is granted, the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed.").

**1052**

trial. The court also grants Ronald La-Hue's motion for acquittal as to count eight. The remainder of the motions for acquittal, new trial, arrest of judgment, and dismissal, are denied. The defendants' motion for production of the government's sentencing memorandum is granted.

### TABLE OF CONTENTS
I. Background .................... 1052
 A. Procedural History and Parties ................. 1052
 B. BVMG's Relationship with Baptist ................. 1053
 C. Laboratory and Other Relationships Between Baptist and BVMG ....... 1059
 D. BVMG's Relationship with Other Hospitals .......... 1060
 1. St. Joseph Medical Center .............. 1060
 2. Deaconess Hospital ..... 1060
 3. Bethany Medical Center.................. 1061
 4. Alexian Brothers Hospital ............... 1061
 5. Liberty Hospital........ 1061
II. Motions for Acquittal ........... 1061
 A. Standard.................. 1061
 B. Robert and Ronald LaHue.. 1062
 C. Dan Anderson ............. 1064
 D. Dennis McClatchey......... 1065
 E. Unlawful Inducement....... 1068
III. Motions for New Trial .......... 1069
 A. Standard.................. 1069
 B. Variance ................. 1070
 C. Severance ................. 1073
 D. Jury Instructions .......... 1074
 1. Instruction Nos.32 and 33 .................. 1074
 2. Instruction No. 30 ...... 1076
 3. Instruction Nos. 36 and 37 .............. 1076
 4. Instruction Nos. 7 and 21 .................. 1077
 5. Instruction No. 24 ...... 1077
 E. Coconspirator Hearsay ..... 1079
 F. Prosecutorial Misconduct.... 1079
 1. Preindictment Delay .... 1080
 2. Judicial Immunity ...... 1081
 3. Other Alleged Misconduct ................. 1081
IV. Arrest of Judgment ............ 1082
V. Production of Sentencing Memo.. 1082

## I. Background

### A. Procedural History and Parties

On July 15, 1998, a grand jury returned a twelve-count superseding indictment charging seven defendants with conspiracy pursuant to 18 U.S.C. § 371 (count one). The indictment also charged each defendant with one or more substantive violations of the Medicare Anti–Kickback Act pursuant to 42 U.S.C. § 1320a–7b(b) (counts two through ten). Two defendants were charged with false claims conspiracy pursuant to 18 U.S.C. § 286 (count eleven), and one defendant was charged with witness tampering pursuant to 18 U.S.C. § 1512 (count twelve).

Throughout this case, the court and the parties have placed the defendants into three distinct groups. One group, which the parties and the court have referred to generally as the doctor defendants, consists of two brothers, Drs. Robert and Ronald LaHue. The Drs. LaHue are osteopathic physicians, and were the longtime principals of a now-defunct organization called Blue Valley Medical Group ("BVMG"). BVMG was wholly owned by Robert LaHue, and Ronald LaHue was at all times a key employee. A second group, which the parties and the court have referred to generally as the hospital executive defendants, consists of Dan Anderson, Dennis McClatchey, and Ronald Keel. All of the hospital executive defendants worked for Baptist Medical Center ("Baptist"), a Kansas City, Missouri hospital. Dan Anderson was the President and Chief Executive Officer of Baptist, Dennis McClatchey was Senior Vice President and Chief Operating Officer, and Ronald Keel was a Vice President whose responsibilities included monitoring the relationship between Baptist and BVMG. A third group, which the parties and the court have referred to generally as the lawyer defendants, consists of attorneys Ruth Lehr and Mark Thompson. Both attorneys represented Baptist at various times during the course of the alleged conspiracy.

In count one, the indictment alleged a conspiracy among all seven defendants to offer, pay, solicit, and receive remuneration in return for Medicare patient referrals at seven different hospitals in the

Kansas City, Wichita, and St. Louis areas. The count one conspiracy allegedly involved all of the substantive conduct alleged in counts two through ten. Count two alleged substantive violations of the Medicare Anti–Kickback Act against the doctor defendants in connection with BVMG's relationship with Baptist. Count three alleged substantive violations of the Medicare Anti–Kickback Act against the hospital executive defendants and attorney Ruth Lehr in connection with Baptist's relationship with BVMG. Count four alleged similar conduct against attorney Mark Thompson. Counts five through ten alleged substantive violations of the Medicare Anti–Kickback Act against the Drs. LaHue in connection with St. Joseph Medical Center in Wichita, Deaconess Hospital in St. Louis, Bethany Medical Center in Kansas City, Kansas, Alexian Brothers Hospital in St. Louis, Liberty Hospital in Liberty, Missouri, and Olathe Medical Center in Olathe, Kansas, respectively. Count eleven alleged a false claims conspiracy against the Drs. LaHue in connection with their practices at BVMG. Count twelve alleged witness tampering against Robert LaHue.

Over the course of the nine week jury trial, portions of the indictment were pared away. Specifically, the court severed counts eleven and twelve, holding the counts improperly joined pursuant to Fed. R.Crim.P. 8(b). The court granted the doctor defendants' motion for acquittal as to count 10, involving Olathe Medical Center, on statute of limitations grounds. The court granted the lawyer defendants' motion for acquittal on all counts, holding the evidence to be such that no reasonable jury could conclude that the lawyer defendants had the criminal intent necessary to commit the crimes alleged. The court also held that as to the count one conspiracy charge, the evidence was such that no reasonable jury could conclude that the hospital executives and lawyers had any involvement with a conspiracy at hospitals other than Baptist. In the end, the case was submitted to the jury only on the Baptist conspiracy charged in count one, the substantive violations involving Baptist alleged in count two against the doctors and count three against the hospital executives, and the substantive violations against the doctors alleged in counts five through nine.

The jury convicted four of the five remaining defendants, finding specifically that the four were involved in a conspiracy at Baptist and that they committed the substantive anti-kickback violations with respect to Baptist alleged in counts two (Robert and Ronald LaHue) and three (Dan Anderson and Dennis McClatchey). The jury acquitted the fifth defendant, Ronald Keel, on all charges based on his statute of limitations defense. The jury convicted both LaHues on counts seven through nine, involving Bethany Medical Center, Alexian Brothers Hospital, and Liberty Hospital. The jury convicted Robert LaHue and acquitted Ronald LaHue on counts five and six, involving St. Joseph Medical Center and Deaconess Hospital. Put another way, Dan Anderson and Dennis McClatchey, then, were convicted of counts one and three. Robert LaHue was convicted of counts one, two, and five through nine. Ronald LaHue was convicted of counts one, two, and seven through nine.

## B. BVMG's Relationship with Baptist[2]

In the early 1980s, Drs. Robert and Ronald LaHue were associated with University Hospital, the teaching hospital formerly affiliated with the osteopathic school in Kansas City, Missouri. The LaHues had attended the school, and over time began sending patients to and treating patients in University Hospital. Both doctors were part-time faculty members.

The LaHues did not deliver their health care services in a traditional manner. Instead of operating out of a clinic, for exam-

---

**2.** In accordance with the applicable standards under Fed.R.Crim.P. 29 and 33, these facts are related in a light most favorable to the government.

ple, the LaHues built their practice by treating patients in nursing homes. BVMG was the trade name under which the doctors practiced. By 1984, BVMG had a "census," or patient population, of approximately 2,500 nursing home patients in the Kansas City metropolitan area. The uncontroverted evidence at trial was that BVMG's large patient base was in substanital part due to the LaHues' willingness to go to nursing homes to treat patients—serving a market that other doctors considered undesirable. Typically, the only care available to most nursing home patients from physicians involved costly ambulance rides to a hospital emergency room for acute care. Chronic ailments were often not addressed.

In approximately the Fall of 1984, the LaHues sought a teaching salary increase from University Hospital. The LaHues told University that if the hospital wasn't interested in increasing the salary, "they [the LaHues] would be no longer putting patients in our institution. They'd be moving them to Baptist." Tr. at 39. Ronald LaHue told University Hospital that the LaHues didn't want to be disloyal to the school, but "business is business." Tr. at 41. Robert LaHue told University Hospital that Baptist had offered to pay the LaHues $120,000 to $140,000 to move their patients. University Hospital refused to pay.

The LaHues' conversations with University Hospital occurred contemporaneously with discussions among Ronald Keel and others at Baptist about the possibility of entering an arrangement with the LaHues that was similar to the arrangement at University Hospital. Mr. Keel, who was a neighbor of Ronald LaHue, presented the idea initially to Mr. Anderson and later to the rest of the administrative staff, including Dennis McClatchey, to pay the doctors to affiliate with Baptist. Baptist considered various alternatives, including an outright purchase of BVMG. In the context of a preliminary proposal to purchase the medical laboratory operated by BVMG,

Clem Fairchild, a well respected corporate attorney who was inexperienced in the complexities of healthcare law, drafted a proposed agreement that specifically linked the purchase of the laboratory with patient referrals. Mr. Fairchild forwarded the proposal to Baptist CFO Gerald Probst,[3] and copied Mr. Anderson. Ruth Lehr vetoed the idea as a blatant violation of Medicare Fraud and Abuse law.

Rejecting the idea of a purchase for the time being, Baptist ultimately decided to enter an arrangement making the LaHues "Co–Directors of Gerontology" and paying them $75,000 per year each. When the LaHues began receiving their $75,000 annual payments from Baptist, BVMG referrals to University Hospital dropped dramatically and BVMG began referring large numbers of patients to Baptist. Although the formal contractual relationship between Baptist and the LaHues changed periodically over the next ten years in terms of the services the LaHues were scheduled to perform, the $75,000 annual payments continued unabated until approximately July 1994. Mr. Anderson directed the $75,000 payments, but although there is overwhelming evidence indicating Mr. McClatchey knew about the payments, there is no evidence he acted affirmatively to bring them about.

It is important to point out, too, that there was no evidence at trial that the referred patients received substandard care at Baptist. To the contrary, Baptist came to be widely recognized as a premier provider of gerontology services. There was also no evidence at trial that the referral relationship affected patient choice. To the contrary, where patients or their families expressed a hospital preference, BVMG worked to honor the request. There was, moreover, no evidence at trial that any patient received unnecessary services. To the contrary, witness after witness testified that the BVMG/Baptist patient referral system had appropriate

---

3. Mr. Probst testified for the government at trial under a grant of immunity.

checks and balances to guard against such abuses.

In the mid 1980s, about the time Baptist's relationship with BVMG began, the Medicare system changed the way it reimbursed hospitals for inpatient services. Previously, Medicare reimbursed hospitals for the actual cost of providing medical services. In an effort to curtail rising costs, however, Medicare implemented a system of payment based on Diagnostic Related Groups, or DRGs. Under the DRG system, Medicare reimbursed hospitals for particular diagnoses, irrespective of how much the hospital spent to care for the patient. The DRG system, plus competition in the Kansas City health care market, created a need for Baptist to fill its inpatient beds. Defendant Anderson was concerned about filling the beds by keeping admissions up. Admissions from BVMG helped Baptist fill its market-based need.

On January 9, 1985, Mr. McClatchey reported to the hospital's department directors that BVMG had named Baptist as its "hospital of choice." He reported that BVMG represented approximately 3,500 nursing home beds, and explained the hospital's plans for how to deal with the influx of elderly patients. At a hospital Board of Trustees meeting on March 21, 1985, Mr. Anderson, after reporting on the hospital's decision not to purchase any part of BVMG, reported the LaHue management services arrangement and reported to the hospital Board of Trustees that "[d]uring the first two and one-half months of operation the Blue Valley Medical Group has admitted 145 patients to the hospital, and outpatient business is steadily growing."

At some point in the summer of 1985, the LaHues approached Mr. Anderson seeking help in managing their practice. The LaHues suggested that Baptist employee Tom Eckard, essentially a marketing specialist with whom the LaHues were

familiar, be assigned to help them organize their practice. Mr. Anderson agreed, and Mr. Eckard became "Director of Geriatric Services." Mr. Eckard described his job as "liaison function between Baptist Medical Center and Blue Valley Medical Group."[4] Tr. at 4346. Based on his discussions with Mr. Anderson, Mr. McClatchey, and Mr. Keel, Mr. Eckard understood his primary job duty was to "maintain the relationship with Blue Valley Medical Group on behalf of Baptist Medical Center in order to assure that the flow of patients to the hospital would continue." Tr. at 4346. Mr. Eckard, of course, also assisted BVMG with organizational matters, which was not a strength of the LaHues. Ms. Lehr originally drafted an agreement whereby BVMG would pay Baptist for Mr. Eckard's services, but the LaHues balked, and no payments were made. In effect, although Baptist derived considerable benefit from Mr. Eckard's placement with BVMG because Mr. Eckard helped streamline the patient flow, Baptist was loaning BVMG an employee for free. The Eckard arrangement continued from mid–1985 until 1993.

There were problems with the Gerontology Directorship arrangement,[5] so Mr. Keel asked Ms. Lehr to evaluate the possibility of entering a consulting arrangement with the LaHues. Ms. Lehr advised against such an arrangement because it involved potential Medicare Fraud and Abuse concerns. She advised Mr. Keel, with copies to Mr. Anderson and Mr. McClatchey, that a consulting arrangement was acceptable only if "the Drs. LaHue ... perform valid services for [Baptist], regardless of the label used to describe those services, and the compensation must be reasonable." Mr. Keel and Ms. Lehr explored "other types of compensation arrangements," including

---

4. Mr. Eckard testified for the government pursuant to a plea agreement.

5. There was concern that the arrangement violated the hospital's by-laws because the LaHues were not eligible for hospital staff membership.

an option to purchase and a structured buy-out.

Baptist decided to pursue entering into a consulting relationship with the LaHues. On January 7, 1986, Mr. Keel recommended modifying the Gerontology Directorship agreement to reflect accurately the services the LaHues were providing to Baptist.[6] He also recommended reducing the annual payments to the LaHues from $75,000 each to $50,000 each, apparently because the Adult Health Care system at Baptist was now up and running and the hospital no longer needed the same level of service from the LaHues. Mr. Anderson okayed the recommendation for accurately specifying the LaHues' services, but wanted to "discuss" Mr. Keel's recommendation to reduce the fees. The fees were never reduced. Mr. McClatchey was copied on Mr. Keel's written recommendations, but there is no evidence he took part in or knew about the subsequent fee discussion or why the fees were not reduced.

Mr. Keel consulted with Mr. Eckard to identify services the LaHues could perform pursuant to the consulting contract. Ms. Lehr drafted the resulting agreement. Mr. McClatchey was copied on letters explaining the modifications to the contract, and he was "aware and involved in contract development." Govt. Ex. 68. Mr. Anderson and both Drs. LaHue signed the revised contract, which called for the LaHues to perform specified consulting services both within the hospital and outside the hospital, in nursing homes.

The Drs. LaHue actually performed only minimal services under the contract. In March of 1987, Deb Grimes, a Baptist employee involved with the gerontology program, informed Mr. McClatchey that the LaHues were not performing the functions set forth in the consulting agreement, except for attending the quarterly Adult Health Care staff meetings. Ms. Grimes met with Mr. McClatchey, who said he would "take care of it." Tr. at 7831. Mr. McClatchey directed hospital staff to "round" with the LaHues as specified in the contract, and those rounds immediately began. The evidence was undisputed, in any event, that Mr. McClatchey did not have day-to-day responsibility to monitor contract compliance. Mr. Eckard testified that Mr. McClatchey, when notified about contract compliance problems, made efforts to ensure compliance, but that the compliance within the hospital eventually tapered off because of resistance among hospital staff. The hospital front-line staff apparently had little interest in interacting with the LaHues.[7]

Also in 1987, some executives at Baptist began to realize that Mr. Eckard's allegiances were not entirely with Baptist and that the arrangement might have private inurement ramifications under federal tax law. In light of these concerns, Mr. McClatchey and Mr. Probst recommended to Mr. Anderson that Mr. Eckard be terminated. Mr. Anderson declined. Mr. Anderson "had an understanding that the physicians weren't in a position to employ Mr. Eckard, 'cause of financial reasons or concerns', and had a concern relative to that recommendation and proceeding with it in that it would disrupt or create a problem with the relationship between the Medical Center and [BVMG] or, specifically, the physicians." Tr. at 1208 (Probst).

By early 1991, Baptist was involved in merger discussions with other hospitals in the Kansas City area. These discussions

---

6. Mr. Eckard described the services the La-Hues were performing pursuant to the agreement as "minimal to none." Tr. at 4404. He further testified that Baptist did not attempt to collect reimbursement for the services required but not performed. Tr. at 4407–08.

7. Mr. Eckard testified, "In questions to Mr. Keel and Mr. McClatchey, primarily where I kept asking why there wasn't more pressure put on the departments ... to allow lectures or consulting to occur or why rounds weren't continuing to be done in the nursing homes [by hospital nurses], I was given the impression that—that it had been tried but there wasn't a lot of interest there, and that the pressure was going to be taken off or had been taken off and basically met with resistance and decided not to continue to push for it." Tr. at 5570.

eventually resulted in a merger whereby Baptist became a subsidiary of a corporation called Health Midwest. In connection with the merger, attorney Mark Thompson reviewed Baptist's physician contracts, and identified the BVMG relationship as a problem area. After speaking about the relationship with Ms. Lehr, Mr. Thompson reported in a January 30, 1991 due diligence memo that "the history of the negotiation over this contract causes [Ms. Lehr] to wonder if the services called for are in fact being rendered.... [I]t may be a good idea to discuss with Baptist management whether the services called for in the contract are in fact being rendered and whether this is backed up by evidence in Baptist's files." Govt. Ex. 129. He also reported Ms. Lehr's feeling that "if these services are in fact being rendered as provided in the contract, then the $75,000 fee paid to each of them is fair compensation." *Id.*

In the summer of 1991, Mr. Keel proposed a change in the 1986 contract. The hospital had learned that Mr. Eckard was involved in helping the LaHues market their "system" to other hospitals in Kansas City and to hospitals in Wichita and St. Louis. In response, Mr. Keel suggested that Mr. Eckard no longer be employed by Baptist, that the contract be modified to explicitly direct patients to hospitals within specified postal zip codes, and that the hospital increase the amount of fees paid to the LaHues by $70,000, which was the approximate amount of Mr. Eckard's salary at the time. Mr. Keel directed his suggestions to Mr. McClatchey, who forwarded them to the hospital's lawyers. The hospital did not adopt the recommendations.

In August of 1991, Mr. Thompson informed Mr. Keel, with copies to Mr. McClatchey and Mr. Anderson, that the 1986 agreement did not meet the Anti-Kickback Act safe harbor regulations.

Mr. Thompson recommended making good faith efforts to bring the contract into compliance with the safe harbor regulations, which would have required a clause specifying intervals of service and the rate to be charged per interval and more extensive documentation that the services specified were actually being performed. Mr. Thompson also indicated, however, that the services which were specified in the existing contract to be rendered by the LaHues "appear to be substantial."

The parties set out to draft a new contract, and negotiations went back and forth. Mr. Keel left Baptist in late 1991,[8] and responsibility for contract negotiation fell into the lap of Baptist Vice President Kevin McGrath, who reported directly to Mr. McClatchey.[9] Robert LaHue told Mr. McGrath that the doctors "were having difficulties in performing some of the services that were delineated in the contract." Tr. at 2753. Mr. McGrath shared that information with Mr. Anderson and Mr. McClatchey. Mr. McClatchey was surprised to learn the information, and directed Mr. McGrath to check out the problem and report back.

The parties, including Mr. McClatchey, Mr. McGrath, Mr. Thompson, the Drs. LaHue, and Mr. Eckard, went through numerous contract drafts and revisions, all drafted and reviewed by Mr. Thompson. In one draft agreement, Mr. McClatchey highlighted an area he believed ought not to be part of the agreement because he was concerned the services would not occur. On November 4, 1992, Mr. Eckard forwarded Mr. McGrath a list of job duties from Robert LaHue. Mr. McGrath forwarded the list to Mr. McClatchey, calling it "not very complete."

On November 5, 1992, the FBI appeared at Baptist to interview Mr. McClatchey and Mr. Anderson concerning the hospi-

---

**8.** Mr. Keel was ultimately acquitted because the jury found he withdrew from the alleged conspiracy when he left Baptist in late 1991, prior to the critical date for statute of limitations purposes.

**9.** Mr. McGrath testified for the government under a grant of immunity.

tal's relationship with BVMG, specifically seeking information about the consulting fees and the Eckard arrangement. Immediately following the FBI visit, Baptist employed attorneys from Baltimore specializing in civil and criminal health care fraud cases. *See United States v. Anderson*, 55 F.Supp.2d 1163 (D.Kan.1999) (government violated the Baltimore attorneys' due process rights by publicly labeling them as unindicted coconspirators in pretrial documents). In a November 11, 1992 meeting, the Baltimore attorneys recommended documenting actual performance of consulting duties. Such a move, according to Baltimore counsel, would move the contract issue "out of the criminal arena and into the civil side." Govt. Ex. 182A. The parties at the meeting agreed to change the consulting relationship to a new part-time employment contract which more accurately described the services that were actually being performed. The Baltimore attorneys were even more pointed with respect to the Eckard arrangement. The group decided that, "as quickly as possible, we need to get [Mr. Eckard] off the Baptist payroll and onto the payroll at Blue Valley Medical Group." *Id.*

Health Midwest attorney Gina Kaiser testified that it was Mr. McClatchey's responsibility to fix the Eckard arrangement. The LaHues initially were unresponsive to the hospital's demands, but agreed to come to the table to discuss modifying the arrangement after the hospital gave them an ultimatum date. When BVMG finally came to the table, there were a series of meetings among Robert LaHue, Mr. McClatchey, and Mr. Thompson. It became clear that BVMG had no intention of putting Mr. Eckard on its payroll, so Mr. McClatchey decided to bring Mr. Eckard back to Baptist effective March 1, 1993.

At least initially, Mr. McClatchey seemed reluctant to cut all ties between Mr. Eckard and BVMG. In early February 1993, as the parties were hammering out the specifics of Mr. Eckard's return, he asked Mr. Thompson whether it would be appropriate to send Mr. Eckard on site at BVMG from time to time. Also in this prereturn-to-Baptist time frame, Mr. McClatchey asked Mr. Eckard to "list what my being pulled out of Blue Valley Medical Group would mean in terms of lost service or things that the practice—Dr. Bob LaHue was getting from me that he would no longer be getting." Tr. at 4517. Mr. Eckard testified that Mr. McClatchey was "concerned about the negative impact my removal from the Blue Valley practice would have on the relationship with Blue Valley Medical Group." Tr. at 4518.

On an early February draft of Mr. Eckard's new written job description, Mr. Eckard reassured Mr. McClatchey that "Bob LaHue sees [the proposed new relationship] as 'no real change.'" Govt. Ex. 204. The job requirements included Mr. Eckard marketing Baptist services to nursing homes who, he reported, saw him as "BVMG's Administrator." *Id.* Mr. Eckard testified that the proposed job description differed from what he was doing previously in that "[i]t was more Baptist oriented and less specifically Blue Valley Medical Group oriented." Tr. at 4519. Nonetheless, it did involve some duties related to BVMG. At least according to Mr. Eckard, his purpose after the change remained "[t]o maintain the relationship between the Blue Valley Medical Group and the hospital in order to assure the continued flow of patients." Mr. Eckard did not, however, go so far as to say that Mr. McClatchey or anyone else so instructed him or was aware that he saw his job in that light.

In this vein, it is important to note that there was overwhelming evidence at trial indicating that Mr. Eckard, unbeknownst to the hospital administrators, engaged in self-dealing efforts which had the effect of promoting BVMG's interests over Baptist's. He surreptitiously negotiated with Robert LaHue to obtain 10 percent commissions on all new consulting fee business (i.e. with non-Baptist hospitals), and also negotiated a car allowance with BVMG despite Mr. Keel's explicit instruction that

he not do so. Even after Mr. Eckard returned to Baptist, there was evidence that he took steps to conceal his BVMG-related activities from the Baptist administrators. He continued corresponding with other hospitals on behalf of BVMG without informing anyone at Baptist.

The February 12, 1993 final draft of Mr. Eckard's new job description differed from the early February proposal in that it omitted any reference to any work with BVMG, and instead involved marketing efforts with "area Long Term Care Physicians." Govt. Ex. 205. The duties under that portion of the job description, however, were markedly similar to the duties in the previous draft that explicitly related to BVMG. Mr. Thompson reported to Baltimore counsel that he and Mr. McClatchey planned to emphasize to Robert LaHue in a February 15 meeting "that the new job description replaces the old one and that nothing in the new description implies any services to the LaHues in their practice." *Id.*

True to Mr. Thompson's word, Mr. McClatchey suggested a laudable alternative solution at the February 15 meeting. Despite his earlier inquiries of Mr. Thompson and Mr. Eckard concerning how to let Mr. Eckard continue to be a free benefit to BVMG, Mr. McClatchey proposed a new alternative—having BVMG pay Baptist for Mr. Eckard's services. Dr. LaHue apparently declined. Also during these meetings, Dr. LaHue asked Baptist to purchase BVMG, increase BVMG's annual take, or base the fees paid on a per patient basis. Baptist refused. Mr. Eckard returned to full-time hospital duties as of March 1, 1993.

Mr. Anderson and the LaHues finally executed a new agreement, titled a "Medical Group Services Agreement," on April 1, 1993. The agreement contained at least some of the services that had been identified as areas of nonperformance in the past.

Mr. Eckard left Baptist in September 1993 to pursue his own start-up business which he intended to compete with BVMG.

Mr. McClatchey left Baptist in October 1993 to begin an unrelated employment position with Health Midwest.

On November 26, 1993, Robert LaHue wrote a letter of termination to Mr. Anderson. Pursuant to the terms of the agreement and the letter, the agreement was to terminate as of February 28, 1994 because of a proposed sale of BVMG to Vencor, an entity unrelated either to Baptist or BVMG. After receiving the letter, Mr. Anderson worked to develop a strategy to replace the BVMG patients, but did nothing to replace the LaHues' consulting services. Baptist began quiet efforts to compete with BVMG for control of nursing home beds.

The Vencor sale fell through. The parties entered another agreement dated March 1, 1994 that listed the same, but fewer, contractual duties for the LaHues to perform. This agreement was to last only for three months. Later in March, Ronald LaHue met with Mr. McGrath to discuss Baptist's efforts to compete with BVMG for nursing home patients, which the LaHues apparently had begun to perceive. Dr. LaHue told Mr. McGrath that BVMG "feels they have value in the 2,000 nursing home beds they control. They wish to work out any arrangement with Health Midwest that pays them for this value." Govt. Ex. 232. Later, on March 18, 1994, Dr. LaHue proposed a "sale" of approximately 2,300 nursing home beds in the Kansas City area for $2,500,000 and future employment. Baptist refused. Discussions to save the relationship continued until January 1995, when the relationship finally ended.

## C. Laboratory and Other Relationships Between Baptist and BVMG

Effective June 1, 1986, BVMG and Baptist formalized a laboratory services agreement. Under the agreement, BVMG collected specimens, and Baptist performed necessary lab testing. BVMG billed Medicare, and split the net revenues with Baptist on a fifty-fifty basis. The agreement

▮▮▮▮▮▮▮▮▮▮▮

was renewed in 1988, but the allocation was split to allow BVMG to collect nearly two-thirds of the revenues. Under the agreement, it was BVMG's responsibility to collect all receivables. Mr. McClatchey signed the 1988 renewal agreement.

In 1986, BVMG fell behind in collecting the receivables. Tom Eckard proposed an idea to Baptist whereby Baptist would hire a temporary employee to bring the lab up to date in its billing practices. Mr. Eckard sold his idea to Mr. Keel (who apparently obtained Mr. McClatchey's approval) by arguing that BVMG had little interest in collecting the receivables in a timely manner and the hospital needed to shore up its accounting for those receivables. The project resulted in a nice net income for the hospital.

In the early 1990s in response to new regulations from Congress relating to lab referrals, BVMG needed to restructure its lab arrangement. Mr. Keel recommended, and Mr. Anderson approved, the loan of an employee to BVMG to bring the lab "up to speed." Mr. McClatchey knew about the arrangement but there is no evidence he acted to bring it about.

In 1990, the LaHues approached Mr. Keel about Baptist helping them solicit nursing home referrals from Baptist patients who were in need of nursing home care but otherwise unassigned to any specific nursing home. Mr. Keel implemented this idea with other hospital staff after informing Mr. McClatchey and Mr. Anderson of the plan.

In early 1991, the LaHues asked Baptist for a loan to cover payroll. Mr. McClatchey asked Mr. McGrath to work with Mr. Thompson on documenting a $100,000 line of credit. Mr. Thompson drew up the documents, but the LaHues never drew on the line of credit. There is no evidence that Mr. McClatchey did not intend any loan which might have been made to be repaid.

In 1992, the LaHues asked Baptist to take over the lease of certain office space. Baptist agreed, and began making lease payments as of September, 1992. Mr. McClatchey knew about this arrangement, but it was negotiated by Mr. McGrath and documented by Mr. Thompson. It constituted a beneficial business arrangement from Baptist's perspective, allowing Baptist to aquire needed space at a favorable rate.

### D. BVMG's Relationship with Other Hospitals

#### 1. St. Joseph Medical Center

Beginning in the summer of 1988, and continuing through November of 1989, Robert LaHue and Tom Eckard, acting for and on behalf of BVMG,[10] negotiated an agreement with St. Joseph Medical Center whereby BVMG would refer Medicare eligible patients to St. Joseph Hospital for an ostensible consulting fee. The solicitation was Robert LaHue's idea. The 1988 proposal discussed at the hospital explicitly states that BVMG will refer all its Wichita patients to St. Joseph Hospital. The consulting services outlined in the final version of the contract were similar to the consulting services listed in the Baptist consulting contracts. BVMG did only minimal consulting, and any consulting that was done was done by Tom Eckard—not BVMG. The only benefit to the hospital from the arrangement was the referrals because the services listed were for the benefit of BVMG's nursing home patients, not the hospital. St. Joseph Medical Center paid BVMG $50,000 per year at first, and the amount increased to $100,000 per year in 1992 when BVMG's Wichita patient census had grown substantially.

#### 2. Deaconess Hospital

Beginning in May 1989 and continuing through February 1990, Robert LaHue and Tom Eckard, acting on behalf of

---

**10.** As referenced above, Mr. Eckard had arranged with BVMG to collect a 10% commission on any new consulting fee business.

Baptist personnel were unaware of this arrangement.

BVMG, negotiated an arrangement with Deaconess Hospital whereby BVMG would refer Medicare eligible patients to Deaconess Hospital in return for an ostensible consulting fee. This agreement, like the agreement at St. Joseph Medical Center, provided that Deaconess Hospital would pay $50,000 per year to BVMG. Witnesses testified that despite the consulting services required of BVMG in the agreement, Deaconess Hospital did not need any expertise from BVMG to take care of elderly patients at Deaconess Hospital. BVMG sent Deaconess Hospital patients—nothing more.

#### 3. Bethany Medical Center

Beginning in April 1991 and continuing through May 1991, Tom Eckard and Dr. Chris Murray, acting on behalf of BVMG, on the recommendation of Ronald LaHue, negotiated an agreement with Bethany Medical Center whereby BVMG would refer Medicare eligible patients to Bethany Medical Center in return for an ostensible consulting fee. The solicitation at Bethany Medical Center occurred with the approval of Robert LaHue. When the three BVMG doctors primarily responsible for nursing homes in Bethany Medical Center's area jumped from BVMG to Tom Eckard's new startup business in 1994, Ronald LaHue attempted to reassure Bethany that BVMG would nonetheless send patients. From May 1992 through September 1994, Bethany Medical Center paid BVMG over $169,000.

#### 4. Alexian Brothers Hospital

Beginning in January 1992 and continuing through October 1, 1992, Robert LaHue and Tom Eckard negotiated an agreement with Alexian Brothers Hospital whereby BVMG would refer Medicare eligible patients in return for an ostensible consulting fee. The arrangement here was similar in substance to the arrangements at the other non-Baptist hospitals. Alexian Brothers Hospital paid approximately $190,000 to BVMG during the relationship.

#### 5. Liberty Hospital

At a meeting with Liberty Hospital executives at which Tom Eckard and Robert and Ronald LaHue were all present, BVMG proposed a contract whereby BVMG would be paid for services Liberty was already performing on its own. According to at least one witness at the meeting, "Blue Valley Medical Group approached [Liberty CEO] Joe Crossett about a possible fee in exchange for the patient referrals that they sent." Tr. at 2189. Liberty refused the offer.

### II. Motions for Acquittal

Each defendant seeks acquittal pursuant to Fed.R.Crim.P. 29. Specifically, each defendant asserts that the government's proof was insufficient, as to him, to establish the mens rea element of the charged crimes. Each defendant also asserts that the government's proof fell short of proving the unlawful inducement element of an Anti–Kickback Act violation. The court denies the motions of Mr. Anderson and Robert LaHue because the evidence is sufficient for a reasonable jury to have convicted them beyond a reasonable doubt. The court grants the motion of Mr. McClatchey, because, although the evidence appears close upon first glance, it is upon closer review insufficient to support a jury finding beyond a reasonable doubt on the element of intent. The court grants the motion of Ronald Lahue as to count eight but denies the motion with respect to all other counts.

#### A. Standard

A motion for judgment of acquittal challenges the sufficiency of the evidence. *United States v. Urena,* 27 F.3d 1487, 1490 (10th Cir.1994). In deference to the jury's finding of guilt, the court must view the evidence in a light most favorable to the government. *United States v. Valadez–Gallegos,* 162 F.3d 1256, 1262 (10th Cir. 1998). The court must then determine whether there is substantial evidence to support a verdict of guilt beyond a reason-

able doubt. *Id.* To support a conviction the evidence must do more than simply raise a suspicion of guilt; the evidence must be substantial. *United States v. Taylor,* 113 F.3d 1136, 1144 (10th Cir. 1997). The jury, as fact finder, is entitled to consider both direct and circumstantial evidence, as well as all reasonable inferences therefrom. *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.1986). "Even though rational jurors may believe in the likelihood of the defendants' guilt, ... they may not convict on that belief alone." *United States v. Jones,* 49 F.3d 628, 632 (10th Cir.1995).

As it relates to Drs. Robert and Ronald LaHue, the Anti–Kickback Act provides in pertinent part:

> Whoever knowingly and willfully solicits or receives any remuneration ... in return for referring an individual to a person for the furnishing ... of any ... service for which payment may be made ... under [Medicare] shall be guilty of a felony ....

42 U.S.C. § 1320a–7b(b)(1). As it relates to Dan Anderson and Dennis McClatchey, the Anti–Kickback Act provides in pertinent part:

> Whoever knowingly and willfully offers or pays any remuneration ... to any person to induce such person—to refer an individual ... for the furnishing ... of any ... service for which payment may be made ... under [Medicare] shall be guilty of a felony ....

42 U.S.C. § 1320a–7b(b)(2).

The "willfully" language in the Anti–Kickback Act incorporates a heightened mens rea element. Pursuant to the court's instructions,

> An act is done willfully if it is done voluntarily and purposely and with the specific intent to do something the law forbids, that is, with the bad purpose either to disobey or disregard the law. A person acts willfully if he or she acts unjustifiably and wrongly while knowing that his or her actions are unjustifiable and wrong. Thus, in order to act willfully as I have defined that term, a

person must specifically intend to do something the law forbids, purposely intending to violate the law.

Instruction No. 36; *see also United States v. Jain,* 93 F.3d 436, 440–41 (8th Cir.1996). The conspiracy charges require an identical degree of criminal intent. *See United States v. Jones,* 808 F.2d 754, 755 (10th Cir.1987).

### B. Robert and Ronald LaHue

■ There is ample evidence to support the inference that both Robert LaHue and Ronald LaHue acted with a bad purpose, specifically intending to violate the Anti–Kickback Act at Baptist Hospital. From the beginning of BVMG's relationship at Baptist—the very first conversation over the neighborhood fence between Ron Keel and Ronald LaHue—the relationship between BVMG and Baptist was about patients and what Baptist would have to do for the LaHues in order to obtain referrals. Immediately when Baptist began paying the LaHues $150,000 per year, BVMG's patient referrals to University Hospital came to a virtual halt and Robert and Ronald LaHue each began referring massive numbers of patients to Baptist. This happened immediately after Ronald LaHue told University Hospital representatives that "business is business" and Robert LaHue told University Hospital that Baptist had offered them a large sum to move their patients.

Witness after witness testified that the LaHues performed very few actual services in return for the substantial annual sum they were paid. Mr. Eckard described the services performed by the LaHues as "minimal to none." Although the LaHues did provide some services under the contracts, many of the services specified in the contracts were services related to care of their own patients.

In connection with the February 1993 meetings to fix the Eckard employment arrangement, Robert LaHue out and out asked Baptist to base the LaHues' fees on a per patient basis. In connection with the

1994 meetings after the failed Vencor sale, Ronald LaHue told Kevin McGrath that BVMG "feels they have value in the 2,000 nursing home beds they control. They wish to work out *any arrangement* with Health Midwest that pays them for this value." (emphasis added).

A reasonable jury could conclude from this evidence that the LaHues solicited and received considerable sums of money from Baptist, intending to be influenced by that money in their patient referral decisions. *See* Instruction No. 33. In light of the ample evidence that the LaHues knew that such patient referral schemes are illegal, there was easily enough evidence for a rational jury to convict them of conspiracy and substantive violations of the Anti–Kickback Act at Baptist beyond a reasonable doubt.

Similarly, there was ample evidence to convict Robert LaHue of substantive violations of the Anti–Kickback Act at St. Joseph Medical Center. The solicitation at St. Joseph was Robert LaHue's idea. BVMG did only minimal consulting under the arrangement, and any consulting that was done was done by Mr. Eckard. BVMG referred its patients to St. Joseph, and was paid a substantial sum.

There was ample evidence to convict Robert LaHue of substantive violations of the Anti–Kickback Act at Deaconess Hospital. Robert LaHue negotiated the familiar consulting-fee-type arrangement with Deaconess, who, witnesses testified, did not need any consulting expertise in the geriatric field. In return for $50,000 per year, BVMG sent Deaconess patients and nothing more.

There was ample evidence to convict Robert and Ronald LaHue of substantive violations of the Anti–Kickback Act at Bethany Medical Center and Liberty Hospital. Ronald LaHue suggested BVMG solicit Bethany, and Robert LaHue approved the suggestion. Bethany paid BVMG, Robert's corporation, over $169,000. BVMG sent Bethany patients. When there was a threat to the patient numbers, Ronald attempted to reassure Bethany that BVMG would nonetheless continue to send patients. Robert and Ronald together solicited Liberty Hospital "about a possible fee in exchange for the patient referrals that they sent."

. There was ample evidence to convict Robert LaHue of substantive violations of the Anti–Kickback Act at Alexian Brothers Hospital. Robert LaHue negotiated the familiar consulting agreement, whereby Alexian Brothers paid BVMG approximately $190,000. BVMG did little or no consulting at Alexian Brothers. Moreover, the overwhelming evidence of Robert LaHue's intent to be influenced in his patient referral decisions at the other hospitals is sufficient to support an inference that he had similar intentions with respect to Alexian Brothers. *See* Fed.R.Evid. 404(b).

■ Despite the court's ruling at trial to the contrary, however, the evidence was insufficient to support a conviction of Ronald LaHue for principal or aider and abettor liability at Alexian Brothers Hospital. In order to support conviction under an aider and abettor theory, the government needed to prove that Ronald LaHue "knowingly did some act for the purpose of furthering the commission of that particular crime." Instruction No. 35. The only evidence specifically connecting Ronald LaHue with the arrangement at Alexian Brothers Hospital is the equivocal testimony of Mr. Eckard, Ronald's presence at Alexian Brothers Hospital on one occasion, and the appearance of Ronald's name as a copied recipient on three Alexian Brothers-related documents. Mr. Eckard testified that he discussed the idea to solicit Alexian Brothers with Ronald LaHue and that he "believe[d]" that Ronald approved of the solicitation. Tr. at 4654. This testimony does nothing to show that Ronald did some affirmative act to further the crime because Mr. Eckard's mere belief that Ronald approved is insufficient to show beyond a reasonable doubt that Ronald affirmatively approved. Mr. Eckard also testified, in the context of broad government questions related to the solicita-

tion of all the non-Baptist hospitals as a group, that both Drs. LaHue were "involved in" these relationships. Tr. at 4351. This evidence is too equivocal to support more than a suspicion of guilt because the question and response were too broad; Ronald LaHue was clearly involved in the relationships at Bethany and Liberty and Robert was clearly involved in the relationships with all the non-Baptist hospitals. Ronald's presence at Alexian on one occasion does nothing to support conviction because there is nothing unusual about a doctor appearing in a hospital, and there is no evidence explaining why he was there. *See United States v. Jones*, 44 F.3d 860, 869 (10th Cir.1995) ("The government must prove, through direct or circumstantial evidence, more than mere presence at the scene of the crime even if coupled with knowledge that the crime is being committed."). The three Alexian Brothers-related documents which mention Ronald La-Hue, Govt Exs. 802, 815, and 819, merely list Ronald as a document recipient and do nothing to show that he acted affirmatively to further the Alexian Brothers/BVMG relationship. Accordingly, the court grants Ronald LaHue's motion for acquittal as to count eight. *See United States v. Bindley*, 157 F.3d 1235, 1238 (10th Cir.1998) (quoting *United States v. Jones*, 44 F.3d 860, 869 (10th Cir.1995) ("To be guilty of aiding and abetting, a defendant must willfully associate with the criminal venture and aid such venture through affirmative action.")).

## C. Dan Anderson

■ The court denies Mr. Anderson's motion for acquittal because the evidence at trial was sufficient for a reasonable jury to conclude he willfully violated and conspired to violate the Anti–Kickback Act. From the beginning of the BVMG/Baptist relationship, Mr. Anderson understood Baptist's relationship with the LaHues to be centered around patient referrals and what Baptist would have to do to acquire them. The relationship began when Mr. Anderson agreed in principle to pay the LaHues to associate with Baptist. Only

after the fee was set did the parties begin attempts to justify the fee. Shortly thereafter, Mr. Anderson approved the LaHues' request to assign Tom Eckard to their practice.

Without more, however, the mere chronology of events (i.e. patients following remuneration) is insufficient to infer that Mr. Anderson "purposely intended to violate the law." What makes the Baptist situation different from the relationships between the other hospitals and BVMG is that Baptist endeavored to involve legal counsel much more extensively in an effort to effectuate the relationship, and those lawyers attempted to put it on a legal footing. As the court recognized in granting the lawyer defendants' motions for acquittal at the close of the government's evidence, and which is applicable as well to the starting point in evaluating the evidence of culpability of the hospital executive defendants,

It is undisputed from the evidence that all the lawyers who dealt with or reviewed these transactions ... held good faith beliefs that it was possible to facilitate some business relationship that was legal between the hospitals and BVMG. Even if patient referrals were devoutly hoped for and anticipated; even if the volume of patients could be large; even if the parties might never have come together but for Baptist having embarked on a long range plan that depended on attracting nursing home patients, there is nothing in the evidence or the law that would have a priori precluded a legal relationship from being entered into under these circumstances.

The problem here is that a very simple concept, "payment for patients is illegal," became far from simple as Congress, the Executive Branch, and the Courts got more deeply involved. "Remuneration to induce" language invites judicial interpretation as to what these words mean—indeed, the government in this case adamantly maintains that the words require definition as part of the

jury instructions. Judicial catch phrases like "one purpose rule" [*see United States v. Greber,* 760 F.2d 68, 69 (3d Cir.1985) ] or "primary purpose rule," the reversals of field by the OIG concerning its own interpretation, the checkered history of the *Hanlester* [*Network v. Shalala,* 51 F.3d 1390 (9th Cir. 1995) ] case and the reservation by Congress of a safe harbor provision in the act (the promulgation of regulations concerning which were delayed for a considerable time) all invite lawyers to attempt to devise legal ways for parties to have a relationship which has as a component hoped-for and anticipated referrals. . . .

There were no decisions from the U.S. Supreme Court or from the Eighth or Tenth Circuits, where the activities in question were going on, to guide them. What the evidence unassailably demonstrated is that [the lawyers] steadfastly maintained to their clients that if fair market value were paid for the doctors' practice or for legitimate consulting services, the relationship passed legal scrutiny. Nothing in the evidence or the law suggests otherwise.

Tr. at 7342–45. The court must examine, therefore, whether Mr. Anderson's actions demonstrate that he caused Baptist to pay more than fair market value for consulting services, whether he knew the consulting services were illegitimate, and whether he knew they were not sufficiently being performed.

The government's evidence is sufficient to show that Mr. Anderson knew the payments he directed were more than fair market value for consulting services, that the services specified ultimately proved to be not entirely bona fide, and that the services specified were not sufficiently being performed. When Mr. Keel recommended modifying the relationship in January of 1986 to reduce the amount of fees paid and accurately specify services to be provided, Mr. Anderson approved the latter recommendation but raised questions about the former. The fees were not reduced. A jury could infer from this evidence that Mr. Anderson refused to reduce the fees even when faced with information that the specified consulting services were not being performed. When Mr. Probst and Mr. McClatchey recommended in 1987 that Mr. Eckard be terminated for tax reasons and because his allegiances were beginning to shift, Mr. Anderson rejected the recommendation because he was concerned that firing Mr. Eckard would "disrupt or create a problem with the relationship between Baptist Medical Center and [BVMG]." A jury could infer from this evidence that Mr. Anderson cared little whether Mr. Eckard performed duties for the hospital as long as the patients kept coming. In 1991, Mr. Thompson informed Mr. Anderson that the 1986 agreement did not conform with safe-harbor regulations, but could be brought into compliance if the contract were written to require hourly services at a specified rate and if Baptist undertook to extensively document the services actually being performed. Neither of these recommendations were implemented. Mr. Anderson later learned that the LaHues were having difficulty performing some of the services delineated, but Mr. Anderson made no efforts to limit or end the consulting fees he himself had directed. A jury could infer from Mr. Anderson's repeated "torpedoes be damned" attitude toward paying the annual fees, which he personally directed be paid, that he placed little value on the LaHues' consulting and instead cared only about patient referrals.

The most inculpatory evidence as to Mr. Anderson falls near the end of the Baptist/BVMG relationship. After receiving BVMG's termination letter prior to the anticipated BVMG sale to Vencor, Mr. Anderson worked to develop a strategy to replace the BVMG patients but did nothing to replace the LaHues' consulting services. Again, a jury could infer from this evidence that Mr. Anderson placed little value on the consulting services and instead valued BVMG's patients.

D. Dennis McClatchey

■ The question of whether there is sufficient evidence to support a finding

that Mr. McClatchey joined a conspiracy specifically intending to do something the law forbids, purposely intending to violate the law, initially appears close because of his acknowledged association with the other defendants. The issue is whether, on more careful analysis, it is only this mere association that can properly be inferred. *See, e.g., United States v. Austin,* 786 F.2d 986, 988 (10th Cir.1986) ("A defendant's mere association with conspirators is not enough to support a conspiracy conviction."). In evaluating the motion, the court is ever mindful that it would be entirely improper for it to substitute its judgment for that of the jury. *See United States v. Copus,* 110 F.3d 1529, 1534 (10th Cir.1997). After thoroughly reviewing the trial record, the court concludes that, even viewing the evidence in the light most favorable to the government and drawing every permissible inference in the government's favor, the evidence was insufficient as a matter of law to support a jury finding beyond a reasonable doubt on the element of intent. Accordingly, the court grants Mr. McClatchey's motion for acquittal.

Mr. McClatchey's position is fundamentally different from the positions of Mr. Anderson and the Drs. LaHue. What is illegal under the Anti–Kickback Act is to offer or pay remuneration to induce referrals, or to solicit or receive remuneration in return for referrals. 42 U.S.C. § 1320a–7b(b). The evidence at trial was overwhelming that it was Mr. Anderson, not Mr. McClatchey, who offered and paid remuneration to the LaHues. Specifically, Mr. Anderson directed the $150,000 annual payments to the LaHues and Mr. Anderson assigned Mr. Eckard to assist BVMG. Mr. McClatchey played only a pe-

ripheral role in the alleged offer and payment scheme because there is simply no evidence that he personally offered or paid or directed any remuneration to induce referrals. As such, the government can obtain a conviction only on a coconspirator liability theory. *See Self,* 2 F.3d at 1085, 1089; *Pinkerton,* 328 U.S. at 640, 66 S.Ct. 1180.[11] The evidence was that Mr. McClatchey was in many ways caught in the middle between Mr. Anderson, who (the jury was entitled to find) insisted that the LaHues be paid $150,000 per year and that Mr. Eckard continue to work for BVMG, and Mr. Keel, Mr. McGrath, and Mr. Eckard, who had the day-to-day responsibility for monitoring contract performance.

The government's principal contention at trial was that Mr. McClatchey made the illegal kickback scheme possible by preparing the hospital for the influx of patients and facilitating the hospital's overall relationship with BVMG. He surely did so, as he openly admitted when he took the witness stand at trial. The government may not, however, obtain a conviction merely by relying on actions Mr. McClatchey legitimately took as Chief Operating Officer of Baptist Medical Center. There is nothing illegal or susceptible to an inference of criminal intent, for example, for the Chief Operating Officer of a hospital merely to prepare for an expected influx of patients and facilitate a potentially bona fide relationship with a group of doctors from whom patient referrals are expected as a by-product.

The court has reviewed every shred of evidence the government has marshaled against Mr. McClatchey and conducted its own extremely thorough independent review of the record. Even granting the government all the inferences to which it is entitled, the court's efforts have led it to

---

**11.** That is, Mr. McClatchey's conviction on count three, the substantive count, cannot stand unless he is also guilty of the count one conspiracy. The government cannot support Mr. McClatchey's count three conviction on an aiding and abetting theory because there is no evidence from which a reasonable jury

could conclude he did anything material to the Baptist/BVMG relationship after the statute of limitations critical date in July 1993. *See* 18 U.S.C. § 3282 (5 year statute of limitations); *United States v. Jaynes,* 75 F.3d 1493, 1506 (10th Cir.1996); 18 U.S.C. § 2 (aiding and abetting statute).

the unmistakable conclusion that the evidence was insufficient to support his conviction. Every time Mr. McClatchey appears in the chronology of events in this case, he is either merely a silent document recipient, acting to bring the BVMG/Baptist relationship into compliance with what the lawyers told him was required, or acting in the normal course of his employment as Chief Operating Officer. To be sure, Mr. McClatchey knew there were grave risks attendant to Baptist's relationship with BVMG. But he also knew that the lawyers had given the basic structure their blessing. Every time there is evidence that Mr. McClatchey learned the relationship drifted too far afield from the lawyers' directions, he took serious and decisive efforts to bring the hospital into compliance.

When the BVMG/Baptist relationship was in its infancy, Mr. McClatchey had very little to do with the day to day arrangements. Mr. Anderson directed that the remuneration be paid, and Mr. Keel and Mr. Eckard had responsibility to foster and monitor the relationship. Mr. McClatchey was kept up to date with written correspondence, but took almost no direct action. He knew, for example, that Mr. Keel recommended modifying the relationship in early 1986 to reduce the fees and shore up the terms of the contract, but he had little or no substantive involvement in these activities. Mr. Keel, Mr. Eckard, and Ms. Lehr took on those duties. There is no evidence that any involvement Mr. McClatchey did have in connection with shoring up the contract was anything other than legitimate.

As the relationship progressed, Mr. McClatchey acted only in conformance with his understanding of the law. In 1987, Mr. McClatchey received the memo from Deb Grimes informing him that the LaHues were not sufficiently performing services under the contract. Mr. McClatchey said he would "take care of it." He ruffled feathers and hospital front line staff began using the LaHues' services.[12] His actions were entirely consistent with his understanding that the LaHues needed to be performing valid services for the relationship to be legal, and he had every right to rely on the earlier efforts of Mr. Keel, Mr. Eckard, and Ms. Lehr to draft a contract that was legal. Mr. McClatchey also recommended against increasing the fees to the LaHues in this time period. Moreover, when it later became clear that the Eckard arrangement had tax and other negative implications for the hospital,[13] Mr. McClatchey willingly joined with Mr. Probst to recommend Mr. Eckard's termination.

After the Health Midwest merger, Mr. McClatchey took on a greater role with respect to the Baptist/BVMG relationship, and continued his work to keep it on course. In the summer of 1991, when Mr. Keel made some rather inappropriate suggestions for contract modifications, Mr. McClatchey did not adopt the recommendations but forwarded the ideas to the hospital's lawyers. Later in 1991, when Mr. McGrath told him there were problems with the delivery of services, Mr. McClatchey was surprised and directed Mr. McGrath to check out the problem and report back. In connection with the contract changes Mr. Thompson had recommended, Mr. McClatchey highlighted an area he believed ought not to be part of the contract because he was concerned the activities would not occur. After learning that the Eckard arrangement was a problem, he took decisive action to bring Mr. Eckard back to the hospital.[14]

---

12. Although Mr. Eckard testified that the pressure to comply with the contract was eventually taken off the hospital front line staff, *see* Tr. at 5570, his testimony is unclear about who took the pressure off and about whether pressure was taken off completely or only in limited areas. It permits no inculpatory inference as to Mr. McClatchey.

13. No one had identified the Eckard arrangement as a potential Medicare fraud problem in this time period.

14. Mr. McClatchey's initial inquiries about how to fix the Eckard arrangement without destroying the hospital's relationship with BVMG do not allow for an inference of crimi-

Mr. McClatchey's motion for acquittal is granted because the evidence was insufficient to support the jury's verdict. When Mr. McClatchey's involvement in the BVMG/Baptist relationship is viewed as a whole with all the evidence in the case, his activities allow at most a suspicion of guilt. *See United States v. Valadez–Gallegos,* 162 F.3d 1256, 1262 (10th Cir.1998) ("The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt."). The evidence was simply insufficient for a reasonable jury to find Mr. McClatchey specifically intended to join a conspiracy specifically intending to do something the law forbids. The fact of the matter is that the evidence points to only one conclusion: Mr. McClatchey, like Ms. Lehr and Mr. Thompson, believed the relationship between Baptist and BVMG could be a legal one and acted at all times to keep it on the proper side of the law. He is entitled to judgment of acquittal.

### E. Unlawful Inducement

█ Each defendant also claims that the government's proof is insufficient because there was no evidence that the remuneration offered, paid, solicited, and received was "to induce" or "in return for" patient referrals. Each defendant has a slightly different approach to this argument, but the defendants essentially claim that the government's tactic of showing remuneration paid and patients referred is insufficient unless the government proves beyond a reasonable doubt that the remuneration and patients are somehow linked. The court agrees with the defendants' legal proposition, but concludes that the government's proof was sufficient to provide the necessary link. Accordingly, the motions to acquit on this basis are denied.

The jury instructions on the element of inducement were explicit:

In order to sustain its burden of proof against the hospital executives for the crime of violating the Anti–Kickback statute, the government must prove beyond a reasonable doubt that the defendant under consideration offered or paid remuneration with the specific criminal intent "to induce" referrals. To offer or pay remuneration to induce referrals means to offer or pay remuneration with intent to gain influence over the reason or judgment of a person making referral decisions. The intent to gain such influence must, at least in part, have been the reason the remuneration was offered or paid.

On the other hand, [the hospital executive defendants] cannot be convicted merely because they hoped or expected or believed that referrals may ensue from remuneration that was designed wholly for other purposes. Likewise, mere oral encouragement to refer patients or the mere creation of an attractive place to which patients can be referred does not violate the law. There must be an offer or payment of remuneration to induce, as I have just defined it.

Jury Instruction No. 32; *see also* Jury Instruction No. 33 (as to doctors, statute requires government to prove remuneration "in return for" patient referrals).

The court believes the evidence was easily sufficient for a jury to infer that remuneration was offered, paid, solicited, or received to induce and in return for patient referrals, as those terms are defined in the court's instructions. The LaHues all but explicitly told University Hospital that higher payment offers at Baptist

---

nal intent because the evidence is uncontroverted that Mr. McClatchey was trying to make the relationship legal and relied on Mr. Thompson in dealing with Robert LaHue. He suggested that BVMG should pay the hospital for Mr. Eckard's services, and (with Mr. Thompson) made it clear in no uncertain terms that Mr. Eckard was no longer BVMG's

free employee. Mr. Eckard, of course, continued to facilitate doctor/hospital relationships, but that was to be expected from a hospital marketing specialist. The evidence is uncontroverted that Mr. Eckard's continuing to perform services specific to BVMG upon his return to Baptist was entirely his own doing.

would cause them to move their patients. Mr. Anderson began directing $75,000 per year to the LaHues before the parties had ever established what the LaHues would do for that money. Mr. Eckard described the consulting services the LaHues provided at Baptist and other hospitals as "minimal to none." For Mr. Anderson, the $75,000 payments and Mr. Eckard's services were the starting point. The varying justifications were developed only later.

The defendants argue they are entitled to acquittals because the government provided no evidence that the value of the LaHues' services was less than the amount the hospitals paid. The defendants relied on testimony from medical experts like Dr. Nevada Lee who explained that the services Baptist was paying the LaHues for had real value. The government, in contrast, had no single valuation witness who testified that the hospital paid more than fair market value for the consulting services. In fact, the evidence was overwhelming that the services specified in the consulting contracts, on their face, were not grossly disproportionate with the fees paid. The defendants assert that one of the government's trial themes, a "search for value," impermissibly saddled them in the jury's eyes with an evidentiary burden that should have been placed on the government.

This argument has no merit. Were the government's case based solely on a disparity of value between remuneration paid and services rendered, the defendants' argument might be more persuasive.[15] The government was not, however, required to prove anything about value. The government was required to prove that remuneration was offered, paid, solicited, or received to induce or in return for patient referrals. See 42 U.S.C. § 1320a–7b(b);

Jury Instruction Nos. 32, 33. The government's evidence, as outlined above, is sufficient to allow a reasonable jury to make the necessary inference. The defendants' proof that the consulting services had value was merely evidence the jury was entitled to weigh in considering whether to credit the government's evidence. The jury apparently gave the defendant's proffered "fair market value" justification little weight, as it was perfectly entitled to do.

## III. Motions for New Trial

The defendants assert a number of errors which they believe entitle them to a new trial. Specifically, they contend that (1) there was a prejudicial variance from the indictment, (2) they are entitled to relief from misjoinder and prejudicial joinder, (3) various instructional errors prejudiced them, (4) the court erred in admitting the government's proffered Fed.R.Evid. 801(d)(2)(E) evidence under a joint venture conspiracy theory rather than a criminal purpose conspiracy theory, and (5) various forms of alleged prosecutorial misconduct prejudiced them. The court denies these motions except as to Mr. McClatchey, to whom, in the alternative to its acquittal of him, see Fed.R.Crim.P. 29(d), the court grants a new trial on the variance issue.

### A. Standard

█ Fed.R.Crim.P. 33 provides that the court may grant a new trial to a defendant if required in the interest of justice. Any error which would require reversal on appeal is a sufficient basis for granting a new trial. *United States v. Stiner,* 765 F.Supp. 663, 664 (D.Kan.1991), *aff'd,* 952 F.2d 1401 (10th Cir.1992). A motion for a new trial is not viewed with favor, however, and

---

**15.** The matter would still be of some debate, however. For example, it would have been permissible for the jury to infer lack of fair market value from the retrospective process of setting fees first and specifying services later, and from the evidence that the front line people at the hospital who were supposed to benefit from the LaHues' services had little

interest in actually receiving them. The jury certainly could have considered the testimony given at trial about reasonable value for physician services and the amount of time the government's evidence showed that the LaHues devoted to carrying out their duties under the consulting contracts.

**1070**

should be granted with great caution. *United States v. Chatman,* 994 F.2d 1510, 1518 (10th Cir.1993). The decision to grant a motion for a new trial lies within the trial court's discretion. *United States v. Custodio,* 141 F.3d 965, 966 (10th Cir.), *cert. denied,* 525 U.S. 986, 119 S.Ct. 243, 142 L.Ed.2d 200 (1998).

**B. Variance**

The defendants claim that they are entitled to a new trial because of a prejudicial variance between the indictment and the government's proof. Specifically, Mr. Anderson and Mr. McClatchey claim that they were prejudiced by spillover from what they view as the "other hospitals" conspiracies originally charged against them as part of the broad count one conspiracy but later cut out of count one when the court, at the defendants' request, found at trial that no reasonable jury could find that Mr. Anderson and Mr. McClatchey were part of the broad conspiracy charged.[16] They also claim prejudicial variance from the government's indicting the attorneys yet failing to prove the attorneys criminally culpable. Finally, they claim that the court should have given a multiple conspiracy instruction. After careful review, the court does not believe Mr. Anderson suffered prejudice from the variance and accordingly denies his motion for a new trial. The court reaches the opposite conclusion as to Mr. McClatchey, and therefore grants Mr. McClatchey's motion for a new trial as an alternative to his acquittal.

The Fifth Amendment grand jury guarantee is not violated if a defendant is convicted upon evidence tending to show a more narrow scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment. *See United States v. Wright,* 932 F.2d 868, 874 (10th Cir. 1991) (citations and internal quotation marks omitted) (holding that trial court's

approach of presenting conspiracy charge to jury on only the limited conspiracy supported by the evidence rather than the broad conspiracy alleged in the indictment was proper); *see also United States v. Hornung,* 848 F.2d 1040 (10th Cir.1988) (appropriate to submit narrowed conspiracy charge to jury where evidence does not support broad conspiracy alleged). On the other hand, a variance occurs

> when the evidence adduced at trial establishes facts different from those alleged in the indictment.... However, a variance is not fatal to the government's case unless the variance affects the substantial rights of the accused..... Accordingly, where a single conspiracy is charged in the indictment, and the government proves only multiple conspiracies, a defendant who suffers substantial prejudice must have his conviction reversed.
>
> A defendant's substantial rights are affected in the context of a variance when the jury determines a defendant's guilt by relying on evidence adduced against coconspirators who were involved in separate conspiracies.... In evaluating whether a potential prejudicial spillover impermissibly affected the fairness of a trial in which a variance occurred, we have considered the following factors: (1) whether the proliferation of separate conspiracies in the case affected the jury's ability to segregate each defendant's individual actions and participation, (2) whether the variance caused confusion among the jurors as to the limited use of certain evidence, and (3) the strength of the evidence underlying the conviction.

*United States v. Edwards,* 69 F.3d 419, 432–33 (10th Cir.1995). (citations and internal quotation marks omitted); *see also Wright,* 932 F.2d at 874 ("[A] variance is not harmless if the evidence adduced against co-defendants involved in separate

---

**16.** Although the Drs. LaHue join in Mr. Anderson's and Mr. McClatchey's motions by reference, these issues do not affect them be-

cause they do not claim to have suffered, nor did they suffer, any prejudice from the variance.

conspiracies was more likely than not imputed to the defendant by the jury."). Jury instructions may safeguard a defendant from any impermissible prejudice. *Id.*

 The court agrees with the defendants that there were two variances in this case. The first was the variance the court recognized at trial when it narrowed the count one conspiracy. The second was the variance with respect to the government's failure of proof as to the lawyer defendants. In a typical case, the mere fact that the government fails to convict one or more alleged coconspirators does not create a variance. *See United States v. Diana,* 605 F.2d 1307, 1310 (4th Cir.1979) (jury acquittal of codefendant did not create variance because "there was evidence to show a single four-link conspiracy even though the jury did not convict the members of the fourth link in the chain."). In this case, however, the government failed even to submit enough proof to create a jury issue. The government obtained indictment on the theory that the lawyer defendants were active participants in a conspiracy to create sham contracts to paper over a kickback scheme. The evidence at trial fell far short of proving any impropriety on the part of the lawyers.[17] Accordingly, the court believes a variance occurred. *See Edwards,* 69 F.3d at 432 ("A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment.").

The court does not believe the variance with respect to the other hospitals affected Mr. Anderson's substantial rights suffi-

cient to warrant a new trial. As the court explained in denying the defendants' motion for dismissal for variance at the close of the government's case,

> The Court believes … that the dismissal issue is not even close. The evidence adduced at trial simply tends to show a narrower scheme than the one alleged in the indictment. The Court believes there will be minimal prejudice in going forward without dismissal because there are not a proliferation of separate conspiracies in the case; there are at most two types of conspiracy. There was evidence of one conspiracy at Baptist allegedly involving all the Defendants and there was evidence of separate conspiracies at the non-Baptist hospitals, involving at most the LaHues and one or more unindicted coconspirators. Moreover, the government has presented evidence in a cogent, easily separable fashion, and there is little risk of jury confusion between the two types of conspiracies. In addition, the Court has given limiting instructions at the request of the Defendants as to each of the witnesses and with regard to each of the items of evidence presented as to those counts that involve the non-Baptist hospitals.

Tr. at 7350–51. The evidence against Mr. Anderson, if not overwhelming, was substantial and the court does not believe the case was so close that Mr. Anderson suffered prejudicial spillover from the variance. *See also United States v. Austin,* 774 F.2d 99, 101 (5th Cir.1985) ("The present case differs from *Kotteakos* [*v. United States,* 328 U.S. 750, 772, 66 S.Ct. 1239, 90

---

**17.** Despite the court's acquittal of the lawyer defendants at the close of the government's evidence, the government stubbornly maintained in its closing argument and continues to maintain in its post trial briefing that the lawyer defendants were criminally involved in the alleged scheme. *See* Tr. at 9762 ("The evidence in this case has been that the attorneys were well aware that the—that this was a paying for patients deal and worked to develop agreements that covered up that fact."); *see also* Govt. Response Brief (Doc. 443), at 169 (arguing, despite court's ruling that inference of criminal intent on the part of

the lawyer defendants was unreasonable as a matter of law, that prosecutor's closing argument was proper because "[p]rosecutors … may argue reasonable inferences from the evidence that the jury has seen and heard."). In the court's thorough review of the evidence at the close of the government's case and in the court's even more exhaustive review of the evidence in connection with the pending motions, it found not one shred of evidence that even comes close to indicating that the lawyer defendants acted with specific intent to violate the law.

L.Ed. 1557 (1946) (proliferation of separate conspiracies and defendants required reversal) ] . . . in one significant respect. In *Kotteakos* . . ., the trial judge did not narrow the general conspiracy charge to conform to the proof at trial. The jury was allowed to consider the broad conspiracy even though there was no evidence to show that the defendant had participated in it. The danger of transference of guilt from one defendant to another unrelated defendant was very real. In the present case, however, the trial judge limited the conspiracy charge . . . . The judge instructed the jury not to consider any other agreement . . . or the alleged participation of [alleged coconspirator] Fontenot. These instructions and the careful delimitation of the conspiracy charge submitted to the jury removed any danger of transference of guilt.").[18]

 The variance with respect to the lawyer defendants does not entitle Mr. Anderson to a new trial, either. There was sufficient evidence to convict him independent of the sham contract theory. *See supra*, part II.C. The evidence was sufficient for a jury to find that, despite the attempts of Ms. Lehr and Mr. Thompson to keep the relationship on the right side of the line, Mr. Anderson willfully paid remuneration to induce the LaHues to refer Medicare patients to Baptist. Accordingly, the court denies Mr. Anderson's motion for a new trial on variance grounds.

 The court reaches a different conclusion as to Mr. McClatchey because, as the court explained *supra* at part II.D, Mr. McClatchey's involvement in the alleged scheme was heavily dependent on the scope of the lawyer defendants' involvement. Every time Mr. McClatchey appears in the chronology of events, he is either a silent document recipient, acting to bring the BVMG/Baptist relationship into compliance with what the lawyers told him was required, or acting in the normal course of his employment as Chief Operating Officer. In light of the government's stubborn closing argument to the effect that the lawyers were guilty, the court believes the variance affected Mr. McClatchey's substantial rights.

Also a factor in the court's decision to grant Mr. McClatchey a new trial, albeit a very minor one, is the danger for spillover from the other hospitals evidence. Were this factor standing alone, the court would not grant Mr. McClatchey a new trial. However, one of the circumstances to evaluate in determining whether a defendant's substantial rights are affected by spillover in a variance context is "the strength or weakness of the evidence underlying the jury's conviction." *Wright*, 932 F.2d at 876. This circumstance weighs heavily in Mr. McClatchey's favor because the evidence against him was weak.[19] On the other hand, and as the court explained above in connection with Mr. Anderson, the other two circumstances to evaluate, whether there were a proliferation of separate conspiracies and whether there was a risk of jury confusion, *see id.*, weigh against a new trial based on spillover. In

18. The court recognizes, however, that Mr. Anderson suffered some greater prejudice than he would have suffered if count one of the indictment had made no reference to the other hospitals at all. As charged, count one and the government's opening statement improperly linked him with the LaHues as to the other hospitals. Nevertheless, in a joint trial involving Mr. Anderson and the LaHues that did not involve conspiracy or other charges at the other hospitals, the court likely would have admitted evidence related to the other hospitals on the limited issue of the LaHues' intent at Baptist. *See infra* Part III.C.; Fed. R.Evid. 404(b). Because the evidence was not close as to Mr. Anderson, however, the court does not find that this slight prejudice affected Mr. Anderson's substantial rights.

19. Although evidence concerning the LaHues' solicitations at the other hospitals causes no severance concerns because it would likely have been admitted against them in a joint trial with Mr. McClatchey subject to a limiting instruction prohibiting consideration against Mr. McClatchey, *see infra* part III.C, the count one allegations and the government's opening statement actually linking Mr. McClatchey to the other hospitals make it more likely the jury was led astray by spillover in the variance context in light of the lack of evidence of his criminal intent.

any event, the court grants Mr. McClatchey's motion for a new trial in the alternative to its judgment of acquittal.

■ The defendants also claim prejudice from the court's refusal to give a multiple conspiracy instruction. *See Edwards,* 69 F.3d at 433 ("A multiple conspiracy charge instructs the jury to acquit if it finds that the defendant was not a member of the indicted conspiracy but rather was involved in another conspiracy.") (citation omitted). This argument is without merit because the Tenth Circuit does not require such an instruction "as long as the instructions informed the jury that 'the government had the burden of proving beyond a reasonable doubt the [single] conspiracy as alleged, and that the evidence should be considered separately as to each defendant.'" *Id.* (citations omitted). The court's instructions clearly comply with Tenth Circuit law. *See* Instruction Nos. 3 and 21. Moreover, to the extent the defendants argue that the jury should have been instructed to acquit if it failed to find the broad conspiracy originally alleged in count one, their argument is without merit because the court found dismissal of the case for the count one "other hospitals" variance to be inappropriate as a matter of law. *See* Tr. at 7350–51.

## C. Severance

The defendants, in particular Mr. Anderson,[20] claim that the court erred in denying their motion for severance based on misjoinder, *see* Fed.R.Crim.P. 8(b), and prejudicial joinder. *See* Fed.R.Crim.P. 14. These arguments are without merit.

■ Joinder under Rule 8(b) is proper where defendants "are alleged to have participated in the same act or transaction or the same series of acts or transactions." The test for proper joinder, according to the Tenth Circuit, is whether there is "a common thread to each of the defendants." *United States v. Rogers,* 921 F.2d 975, 984

(10th Cir.1990) (citation omitted). The link "may be established by common evidence as to various counts." *Id.* (citations omitted). "In conspiracy cases, the general rule is that persons indicted together should be tried together." *Id.* (citation omitted). The Tenth Circuit endeavors to "strike a balance in favor of joint trials." *Id.* (citation omitted).

The court denies the defendants' motion for severance on misjoinder grounds because it believes counts five through nine were properly joined with counts one through three. Even though the court ruled that no reasonable jury could conclude the hospital executive defendants were guilty of conspiring to violate the Anti–Kickback Act at the other hospitals, the evidence is uncontroverted that they knew the LaHues were approaching those other hospitals. *See United States v. Anderson,* No. 98–2003001/–07–JWL, 1999 WL 79652, at *2 (D.Kan. Jan.12, 1999) ("The defendants concede that knowledge is a key element in discerning the propriety of 8(b) joinder."). Moreover, counts one through nine were all highly dependent on the common testimony of one witness—Tom Eckàrd. The court believes joinder under Rule 8(b) was proper.

■ Rule 14 provides relief from prejudicial joinder. Severance under Rule 14 is committed to the sound discretion of the trial judge. *United States v. Johnson,* 130 F.3d 1420, 1427 (10th Cir.1997). Severance is appropriate only where a defendant can make a "strong showing of prejudice" from being tried together with his or her codefendants. *United States v. Edwards,* 69 F.3d 419, 434 (10th Cir.1995).

> Prejudice occurs when there is a serious risk that a joint trial [will] compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.... Neither a mere allegation that defendant would have a better

---

**20.** Mr. Anderson specifically moves for a new trial on the issue of prejudicial joinder. The other defendants incorporate his arguments by reference. The court does not consider the motion as to the Drs. LaHue, however, because they do not claim to have suffered prejudice from being joined with one another or with the hospital executive defendants.

chance of acquittal in a separate trial, nor a complaint of the "spillover effect" of damaging evidence is sufficient to warrant severance.

*Id.* (citations and internal quotation marks omitted).

The court denies the motion for severance on prejudicial joinder grounds because it does not believe Mr. Anderson or Mr. McClatchey suffered the high level of prejudice the law requires. Mr. Anderson's arguments are essentially a rehash of his pretrial arguments claiming unfairness in being tried with the LaHues and the lawyers. The court denied Mr. Anderson's motion then, and it denies it again now. The facts of this case, while complicated and voluminous, were presented in an easily separable form.[21] Moreover, the court's instructions to the jury, requiring separate consideration of the evidence as to each defendant, minimized any possible prejudice.[22]

21. The court does not believe the defendants suffered any unfair prejudice in the severance context in the government's closing argument references to the other hospital evidence as evidence sufficient to infer the criminal intent of the LaHues at Baptist. Having carefully reviewed the objected to rhetoric, the court concludes that it properly focused the attention of the jury on the mindset of the doctor defendants and did not improperly implicate the hospital executive defendants. *See United States v. Brewer,* 630 F.2d 795, 803 (10th Cir.1980) ("Where a case is 'vigorously argued by both sides . . . , [t]he closing argument of a prosecutor need not be confined to such detached exposition as would be appropriate in a lecture.' ") (citations omitted). Moreover, the defendants did not object to the references contemporaneously; the plain error rule applies and the court finds no plain error. *See United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); Fed.R.Crim.P. 52(b) (plain error rule).

22. The court notes that the evidence of other hospital solicitations by the LaHues would likely have been admissible against the LaHues (with proper limiting instructions) in a trial of the collective defendants only on the Baptist-related counts. *See* Fed R. Evid. 404(b); 403. The probative value as to their intent, a crucial issue, was very high and the unfair prejudicial effect on them would have been very low. Of course, just as occurred here, that evidence would not have been ad-

### D. Jury Instructions

The defendants claim error in a number of different jury instructions. The court finds these arguments to be without merit. When determining the adequacy of jury instructions, the court must consider the instructions as a whole to determine whether they adequately state the law and provide the jury with ample understanding of the issues and controlling principles of law. *United States v. Edwards,* 69 F.3d 419, 433 (10th Cir.1995).

#### 1. Instruction Nos. 32 and 33 [23]

The defendants claim that Jury Instruction Nos. 32 and 33 were erroneous because they allowed the jury to convict if only "one purpose" of the remuneration offered, paid, solicited, or received was to induce or in return for Medicare patient referrals.[24] *See United States v. Greber,* 760 F.2d 68, 71 (3d Cir.1985); *United States v. Kats,* 871 F.2d 105, 108 (9th

mitted against the hospital executive defendants. Thus, even if the non-Baptist counts had been severed, Mr. Anderson and Mr. McClatchey would have had to contend with the same minimal spillover for which they now seek a new trial.

23. Instruction Nos. 32 and 33 were parallel instructions, with Instruction No. 32 applicable to the hospital executive defendants under the "offer or pay" prong of the statute, *see* 42 U.S.C. § 1320a–7b(b)(2), and Instruction No. 33 applicable to the doctor defendants under the "solicit or receive" prong of the statute. *See* 42 U.S.C. § 1320a–7b(b)(1).

24. Instruction No. 32 is reprinted verbatim *supra* at section II.E. Instruction No. 33 reads as follows:

[I]n order to sustain its burden of proof against the doctor defendants for violating the Anti–Kickback statute, the government must prove beyond a reasonable doubt that the defendant under consideration solicited or received remuneration with specific criminal intent that the remuneration be "in return for" referrals. To solicit or receive remuneration in return for referrals means to solicit or receive remuneration with intent to allow the remuneration to influence the reason and judgment behind one's patient referral decisions. The intent to be influenced must, at least in part, have

Cir.1989). According to the defendants, the law allows conviction only if the "primary purpose" of the remuneration was to induce or in return for Medicare patient referrals. *See United States v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20, 30 (1st Cir.1989); *United States v. Jain*, Nos. 94–00087–01, 94–00087–02–CR–W–6, 1995 WL 9301 (W.D.Mo.1995), *conviction aff'd. in part and rev'd in part on other grounds*, 93 F.3d 436 (8th Cir.1996).

The court thoroughly considered its ruling on this issue at trial and is persuaded that the instructions given were proper. This case was a case of first impression in the Tenth Circuit. Accordingly, the court drafted Instruction Nos. 32 and 33 after extensive pretrial and trial briefing and full oral argument by the parties. It carefully considered Congress' intent in drafting the statute, the views expressed in relevant legal commentary, and the insights to be drawn from the case law on the subject. *See, e.g., United States v. Starks*, 157 F.3d 833 (11th Cir.1998); *United States v. Jain*, 93 F.3d 436 (8th Cir.1996); *Hanlester Network v. Shalala*, 51 F.3d 1390 (9th Cir.1995); *United States v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20 (1st Cir.1989); *United States v. Kats*, 871 F.2d 105 (9th Cir.1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.1985). In the end, the court wrote instructions that it believes accurately capture the essence of what Congress prohibited when it enacted the Anti–Kickback Act. Namely, the instructions make clear that what is prohibited is the offering, payment, solicitation, or receipt of remu-

neration when the remuneration is intended to influence patient referral decisions. *See Greber* 760 F.2d at 71 ("Even if the physician performs some service for the money received, the potential for unnecessary drain on the Medicare system remains. The statute is aimed at the inducement factor."), *quoted in Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d at 30. The instructions also make clear that the statute does not prohibit financial relationships where the remuneration is intended wholly for other purposes but patient referrals are nonetheless otherwise encouraged, hoped for, or made. *See Hanlester Network*, 51 F.3d at 1397 ("mere encouragement would not violate the statute."). The instructions incorporate the apparent Congressional mandate that any remuneration offered, paid, solicited, or received for an improper purpose is illegal, yet the instructions also protect healthcare professionals from being convicted merely because they are astute businesspeople. Despite the defendants' observations and arguments that the court's interpretation of the statute may prohibit many beneficial relationships in addition to those that threaten the integrity of Medicare, the court believes that the extremely broad language of the statute simply does not allow for judicial narrowing. *See* 42 U.S.C. § 1320a–7b(b) ("Whoever knowingly and willfully solicits or receives any remuneration ... in return for [Medicare patient referrals] [and][w]hoever knowingly and willfully offers or pays any remuneration ... to induce [Medicare patient referrals].").[25] The defendants will need to make their arguments in another forum.

---

been the reason the remuneration was solicited or received.

On the other hand, defendants Robert La-Hue and Ronald LaHue cannot be convicted merely because they received remuneration wholly in return for services and also decided to refer patients to the hospital. Likewise, mere referral of patients because of oral encouragement or because of a belief that the place to which the patients are to be referred is attractive does not violate the law. There must be a solicitation or receipt of remuneration in return for referrals, as I have just defined it.

**25.** The court believes the Anti–Kickback Act is not a statute like the one in *United States v. Sun–Diamond Growers*, 526 U.S. 398, 119 S.Ct. 1402, 1410, 143 L.Ed.2d 576 (1999), that can "linguistically be interpreted to be either a meat axe or a scalpel." The statute is simply a meat axe. Nor is the Anti–Kickback Act a statute like the mail and wire fraud statutes where the court must go beyond the language of the statute to infer that Congress intended to incorporate the established meaning of a common law term of art. *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 1840, 144 L.Ed.2d 35 (1999) (mail and wire

### 2. Instruction No. 30

The defendants claim error in the court's instruction that the hospital defendants could be convicted if they offered or paid remuneration "to induce" patient referrals despite the indictment's failure to recite the statutory magic words. The defendants point out that the narrative portion of the indictment explicitly references only a scheme to offer, pay, solicit, or receive remuneration "in return for" patient referrals. By charging the jury with language not explicitly included in the indictment, the defendants claim, the court constructively amended the indictment and violated their Fifth Amendment rights.

This argument has no merit because, despite the narrative language in the indictment, the indictment specifically cited § 1320a–7b(b)(2), the offer or payment to induce prong of the statute. Moreover, the indictment read as a whole fairly apprizes the defendants that the hospital executive defendants were charged with offering or paying remuneration to induce. *See United States v. Mobile Materials, Inc.,* 871 F.2d 902, 906–07 (10th Cir.) (court must view indictment as a whole, with an emphasis on common sense rather than technicalities), *modified on other grounds,* 881 F.2d 866 (10th Cir.1989) (en banc). Accordingly, the defendants are not entitled to a new trial on this basis.

### 3. Instruction Nos. 36 and 37

The defendants renew their contention that Instruction Nos. 36 and 37, the instructions defining the "willfulness" element of the Anti–Kickback Act and the proper means by which the jury could infer willfulness, were improper because the court failed to instruct pursuant to *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) and *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). Under the willfulness element of the statute at issue in *Cheek,* a defendant cannot be convicted of willful violation of the tax laws unless he or she is aware of the specific provision of the tax code that he or she was charged with violating. *Cheek,* 498 U.S. at 201, 111 S.Ct. 604. Similarly, under the willfulness element of the statute at issue in *Ratzlaf,* a defendant cannot be convicted of willful violation of currency structuring laws unless the defendant knows that the structuring of cash transactions to avoid statutory reporting requirements is unlawful. *Ratzlaf,* 510 U.S. at 138, 114 S.Ct. 655. The defendants contend that the Anti–Kickback Act requires the government to make an equivalent showing of intent.

The court has previously rejected the defendants' arguments on this point and now denies the defendants' motions because they argue for a result that the Supreme Court squarely rejected in a recent decision. In *Bryan v. United States,* 524 U.S. 184, 118 S.Ct. 1939, 1945–47, 141 L.Ed.2d 197 (1998), the Supreme Court considered the appropriate definition of the term "willfully" in connection with 18 U.S.C. § 924(a)(1)(D), a statute making anyone who willfully violates, inter alia, 18 U.S.C. § 922(a)(1)(A), which forbids dealing in firearms without a federal license, subject to felony charges. *Bryan* distinguished *Cheek* and *Ratzlaf* by noting:

> Both ... cases ... involved highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct. As a result, we held that [the statutes at issue in *Cheek* and *Ratzlaf* ] "carv[e] out an exception to the traditional rule" that ignorance of the law is no excuse and require that the defendant have knowledge of the law. *The danger of convicting individuals engaged in apparently innocent*

fraud statutes require government to show materiality despite absence of the term in statutory language because common law fraud required materiality). Relative to the centuries of baggage accompanying the word "defraud," the words "to induce" and "in return for" are newcomers as legal terms of art. The court will not engraft a materiality requirement on the Anti–Kickback Act when there is no indication that Congress intended these words to incorporate such a requirement.

*activity that motivated our decisions in [Cheek] and* Ratzlaf *is not present here because the jury found that this petitioner knew that his conduct was unlawful.*

*Bryan,* 118 S.Ct. at 1947 (emphasis added). The situation is the same here. In order to convict any defendant of the crimes charged, the jury was required to find that that defendant "specifically intend[ed] to do something the law forbids, purposely intending to violate the law." Instruction No. 36; *see also United States v. Starks,* 157 F.3d 833 (11th Cir.1998) (applying *Bryan* in Anti–Kickback context and concluding that statute did not require proof that defendant acted with knowledge of the Anti–Kickback Act); *see also United States v. Jain,* 93 F.3d 436, 440–41 (8th Cir.1996) (pre-*Bryan* case approving instruction substantially similar to this court's instruction); *United States v. Dashney,* 117 F.3d 1197, 1201 (10th Cir. 1997). Thus, to convict, the jury was required to find that the defendants knew that their conduct was unlawful. The danger of convicting them based on apparently innocent activity is not present here.

Moreover, even if a *Cheek/Ratzlaf* type instruction were appropriate here, the error was harmless. *See Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 1836–37, 144 L.Ed.2d 35 (1999). The issues in this case had nothing to do with whether the defendants were aware of the Anti–Kickback Act. The defendants at trial readily admitted they knew about the Anti–Kickback Act. They made no claim then and they make no claim now that they were blind-sided by the Act's existence. The essence of the defendants' case was that they were doing everything they could to comply with the dictates of a law they knew about but had difficulty understanding and applying. The issue was whether they knew their conduct violated a law the evidence overwhelmingly indicated they knew about. Accordingly, the defendants'

motion for a new trial on these grounds is denied.

**4. Instruction Nos. 7 and 21**

Mr. Anderson claims that Jury Instruction No. 7, Jury Instruction No. 21, and the instruction given at the close of the government's case might have allowed jury confusion as to the scope of the count one conspiracy. In Instruction No. 7, the court charged the jury that the non-Baptist evidence could be considered only against the LaHues on the substantive counts for which it was offered, and on count one only as to the intent of the LaHues in connection with their dealings with Baptist. In the instruction at the close of the government's case, the court charged the jury that the non-Baptist evidence could be considered only against the LaHues, without limiting the jury's consideration to the issue of intent. In Instruction No. 21, the court charged the jury that it must acquit on the conspiracy charge unless the government proved the specific conspiracy charged at Baptist.

The court rejects this argument. Indeed, it borders on frivolous. Taken as a whole, the jury instructions clearly explain the scope of the count one conspiracy that remained at the close of the evidence. Moreover, to the extent Mr. Anderson argues that the jury should have been charged that the hospital defendants were entitled to acquittal if the evidence failed to prove the broad, seven hospital conspiracy originally charged in the indictment, his argument is without merit for the reasons explained *supra,* section III.B.

**5. Instruction No. 24**

The defendants claim two errors with respect to Instruction No. 24, which instructed the jury on the elements of *Pinkerton* liability.[26] First, they claim that it was error to give the *Pinkerton*

---

**26.** *Pinkerton* liability is a shorthand reference to the concept established in *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), that a conspira-

tor is liable for the reasonably foreseeable acts of his coconspirators committed during the course of and in furtherance of the conspiracy.

instruction because there were no *Pinkerton* allegations in the indictment. Second, they claim that the instruction given was erroneous because it failed to instruct the jury that *Pinkerton* liability was appropriate only if the predicate offense fell within the scope of the unlawful agreement and reasonably could have been foreseen to be a necessary or natural consequence of the agreement.

These arguments do not entitle the defendants to a new trial. The first claim has no merit because the government need not allege *Pinkerton* liability to obtain a *Pinkerton* conviction. *See United States v. Self,* 2 F.3d 1071, 1085, 1089 (10th Cir. 1993) (conspiracy allegations in an indictment allowed court to affirm defendant's conviction for a substantive offense committed by defendant's coconspirator even though the indictment did not specifically allege *Pinkerton* liability as to the substantive count). The second claim has no merit because the court's instructions, taken as a whole, were correct. *See United States v. Edwards,* 69 F.3d 419, 433 (10th Cir. 1995) (court must consider the instructions as a whole to determine whether they adequately state the law and provide the jury with ample understanding of the issues and controlling principles of law). The court gave the following *Pinkerton* instruction:

> A member of a conspiracy who commits another crime during the existence or life of the conspiracy and who commits this other crime in order to further or somehow advance the goals or objectives of the conspiracy, may be found by you to be acting as the agent of the other members of the conspiracy. The illegal actions of this person in committing this other crime may be attributed to other individuals who are then members of the conspiracy. Under certain conditions, therefore, a defendant may be found guilty of this other crime even though he or she did not participate directly in the acts constituting that offense.
>
> If you find that the government has proven that a particular defendant is guilty of the conspiracy as charged in Count 1 of the indictment, beyond a reasonable doubt, you may also find that defendant guilty of the crimes alleged in Counts 2 and 3 of the indictment in which he or she is charged, provided that you find that the essential elements of that count as defined in these instructions have been established beyond a reasonable doubt and, provided further, that you also find beyond a reasonable doubt, that:
>
> *FIRST:* the substantive offense of violating the Anti–Kickback statute as described in Counts 2 or 3 of the indictment was committed by a member of the conspiracy;
>
> *SECOND:* the substantive crime was committed during the existence or life of and in furtherance of the goals or objectives of the conspiracy; and
>
> *THIRD:* at the time that this substantive offense was committed, the defendant under consideration was a member of the conspiracy.

Instruction No. 24. This instruction is drawn verbatim in all material respects from the pattern instruction given in Devitt, Blackmar, & O'Malley, *Federal Jury Practice and Instructions, Criminal 4th* § 28.10 (1990). Although the Tenth Circuit has not directly weighed in on the issue, *cf. United States v. Willis,* 102 F.3d 1078, 1083 (10th Cir.1996) ("the co-conspirator has criminal responsibility unless 'the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.' ") (quoting *Pinkerton,* 328 U.S. at 647–48, 66 S.Ct. at 1184), a number of federal appellate courts have approved instructions identical in all material respects to the court's instruction here. *See United States v. Aramony,* 88 F.3d 1369, 1381 (4th Cir.1996); *United States v. Vasquez,* 858 F.2d 1387, 1393 (9th Cir.1988); *United*

*States v. Manzella*, 791 F.2d 1263, 1267 (7th Cir.1986) (*Pinkerton* instruction nearly identical to this court's instruction "contain[ed] every element of the *Pinkerton* doctrine, arrayed in an order calculated to maximize the likelihood that the jury will grasp this complicated concept."). *But see United States v. Turcks*, 41 F.3d 893, 897 (3d Cir.1994) (error not to give foreseeability instruction, but failure did not amount to plain error sufficient to warrant reversal); *United States v. Broadwell*, 870 F.2d 594, 603 (11th Cir.1989) (error not to give foreseeability instruction, but error was harmless).

In any event, even if the court's instruction was erroneous, the error was harmless because the substantive offenses alleged and proven in counts two and three were also the alleged and proven objects of the conspiracy. *See Willis*, 102 F.3d at 1083 ("the co-conspirator has criminal responsibility unless 'the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy.'"); *Broadwell*, 870 F.2d at 603. Accordingly, the defendants' motion is denied as to their *Pinkerton* argument.

### E. Coconspirator Hearsay

█ The defendants claim prejudicial error in the admission of a great deal of evidence as nonhearsay pursuant to Fed. R. Evid 801(d)(2)(E), the coconspirator hearsay exclusion from the hearsay rule. The court admitted this evidence on a joint venture, or agency, theory and held that Rule 801(d)(2)(E) does not require a showing that the alleged conspiracy was for criminal ends:

> [M]y findings under 801(d)(2)(E) ... are that the five Defendants who remain in the case, along with Ms. Lehr, Mr. Thompson, Mr. Probst, Mr. McGrath and Mr. Eckard, ... all were participants of a common plan to put together

and facilitate and operate and carry out the relationship of Baptist Medical Center and Blue Valley Medical Group for the continuum of care. They participated in a joint venture, if you will, for the purposes of 801(d)(2)(E). And whether there was a criminal intent on the part of any or all of those individuals is something which ... I need not reach .... Therefore, the statements of those individuals that were made in the course of that relationship and in furtherance of that relationship are properly admissible against the five Defendants in this case.

Tr. at 9624–25; *see also United States v. Layton*, 855 F.2d 1388, 1398 (9th Cir.1988). The defendants contend the court's ruling was improper because they believe the hearsay exclusion requires the government to prove by a preponderance of the evidence [27] not only that the declarants were involved in a joint venture, but also that they were involved in a criminal conspiracy. The court does not agree.

This issue is one of first impression in the Tenth Circuit. The court adopts the well reasoned analysis of Judge Alarcon set out in the *Layton* case and believes that the Tenth Circuit, if faced with the question, would agree with that analysis as well. *Layton*, 855 F.2d at 1398–1400. The rule is rooted in agency principles, as are its siblings, Rules 801(d)(2)(C) and 801(d)(2)(D). The court rejects the overly cynical view that 801(d)(2)(E)'s relaxation of hearsay standards is really based on a perceived need to convict criminal conspirators, and, thus, the alleged joint undertaking must have a criminal purpose. The Federal Rules of Evidence do not relax out of expediency other evidentiary standards, merely upon a finding by the court by a preponderance of the evidence that the party or parties against whom the evidence is offered are criminal conspirators.

---

**27.** Evidence proffered pursuant to Rule 801(d)(2)(E) is not admissible unless the trial court finds by a preponderance of the evidence that, among other requirements, a conspiracy existed. *See Bourjaily v. United States*, 483 U.S. 171, 177, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). *Bourjaily* does not address whether existence of a criminal conspiracy is a requisite. In that case, if there was a joint enterprise at all, its ends were undeniably criminal and the issue simply did not arise.

The more sound view, and the one the court adopts, is the one adopted in *Layton* and endorsed by respected commentators Louisell and Mueller:

> Modern authority indicates that the essence of the coconspirator exception is a "combination" among the coventurers, hence that the proponent of a coconspirator statement need not establish by independent evidence that the conspiracy is unlawful. This holding goes far to assure that the coconspirator exception is indeed more properly understood as a "joint venture" exception whose essence is an agreement among the members to pursue some common plan.

4 D. Louisell & C. Mueller, *Federal Evidence* § 427, at 125 (Supp.1987); *cf. United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir.1986) ("The rule embodies a long-standing doctrine, applicable in both civil and criminal cases, founded on general principles of agency and partnership law."). Because the court found there was such an agreement to pursue a common plan, the evidence in question was properly admitted.

### F. Prosecutorial Misconduct

The defendants, and in particular Mr. Anderson, seek a new trial by positing what might be termed a virtual grab bag of arguments falling under the general category of prosecutorial misconduct. As set forth below, the court has carefully considered each of these arguments and found them to be without merit.

#### 1. Preindictment Delay

Claims for preindictment delay receive limited protection under the Due Process Clause of the Fifth Amendment. *United States v. Johnson*, 120 F.3d 1107, 1110 (10th Cir.1997). "Preindictment delay is not a violation of the Due Process Clause unless the defendant shows both that the delay caused actual prejudice and that the government delayed purposefully to gain a tactical advantage." *Id.* (citations omitted). Investigative delay, as opposed to purposeful delay to gain an advantage, is not proper grist for a due process claim. *United States v. Lovasco*, 431 U.S. 783, 795, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

The defendants raised this motion in their pretrial papers, as well. At that time, the court explained:

> The defendants allegations might, if true, make out a case of preindictment delay. The defendants specifically identify a number of individuals who would have testified on their behalf who have died since the government's investigation began and the specific testimony that would have been offered. The defendants also allege facts which might, at some point, allow the court to infer that the government's delay was purposefully designed to gain a tactical advantage, including the government's alleged successful attempts to get Health Midwest to fire some of the defendants and cease paying for their legal expenses.

*United States v. Anderson*, No. 98–20030–01/–07–JWL, 1999 WL 84290, at *13 (D.Kan. Jan.8, 1999).

All of the defendants' pretrial allegations fell flat at trial, and their renewed motion falls flat now. The defendants simply did not suffer any actual prejudice from the government's delay in bringing this case, nor did anything occur at trial which led the court to believe the delay was caused by anything other than logistical investigatory reasons.[28] The defendants' arguments concerning the deaths of various witnesses carry little weight because the evidence these witnesses would have offered would have been cumulative. *See United States v. Comosona*, 848 F.2d 1110, 1114 (10th Cir.1988) (defendant did not show prejudice because of unavailable witnesses where the witnesses' testimony would have been cumulative). Moreover, the merit of the defendants' motion is highly suspect because, as the government points out, two of the now-dead witnesses

---

**28.** Because the allegations do not make out a case of actual prejudice, the court denies the defendants' motions for a hearing on this issue.

on whom the defendants seek to rely died long before the government's investigation at Baptist even began. The defendants' arguments concerning government efforts to get the hospital executives fired or to get Health Midwest to stop paying their legal bills have no merit because the jury never learned that Mr. Anderson had been fired or that Mr. McClatchey had been placed on administrative leave and the defendants do not allege that Health Midwest actually stopped paying either executive's legal bills.

### 2. Judicial Immunity

■ The defendants ask the court to grant a new trial to allow it to grant judicial immunity to certain defense witnesses. The defendants claim that the prosecutor's broad approach to identifying potential coconspirators for purposes of Fed.R.Evid. 801(d)(2)(E) eviscerated their ability to put on a defense because many of the people identified refused to testify on Fifth Amendment self-incrimination grounds. According to the defendants, this was a purposeful tactic by the prosecution to preclude them from putting on helpful witnesses.

The court rejects the defendants' arguments for the same reasons it rejected them before and during trial. The court denied the defendants' request to provide judicial immunity to selected witnesses because Tenth Circuit law indicates that "courts have no power to independently fashion witness use immunity under the guise of due process.... [T]he power to apply for immunity ... is the sole prerogative of the [executive branch of] government." *United States v. Hunter*, 672 F.2d 815, 818 (10th Cir.1982). Despite the de-

fendants' arguments, there is no indication that the government engaged in a "deliberate attempt to distort the fact finding process." *See id.* (reserving ruling on whether judicial immunity was appropriate in such highly offensive situations).[29]

### 3. Other Alleged Misconduct

The defendants seek a new trial because of claimed government outrageous conduct, both before trial and during trial, in the form of intimidation of witnesses and improper remarks to the jury. The court denies the motion because despite instances of prosecutorial excess, the misconduct did not reach the level of a due process violation.

■ The touchstone of due process analysis in cases of alleged prosecutorial misconduct is "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 220, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). To justify a new trial, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *United States v. Chapman*, 615 F.2d 1294, 1301 (10th Cir. 1980) ("Every slight excess of the prosecution does not require that a verdict be overturned and a new trial ordered.").

■ The court has reviewed all the alleged misconduct and concludes that most of it was not misconduct at all. For example, of the countless alleged improper remarks in the government's closing, only two were actually improper.[30] The first

---

**29.** As an alternative form of relief, the court granted the defendants an opportunity under the residual exception to the hearsay rule, *see* Fed.R.Evid. 807 (hearsay not subject to any exception may be admitted if, among other requirements, it has equivalent circumstantial guarantees of trustworthiness), to call the attorneys of some of these witnesses to testify concerning what the witnesses told FBI agents in government interviews. *See* Tr. at 9321 ("[I]n place of the oath which we fre-

quently look to as a guarantee of reliability, we have 18 U.S.C. § 1001 (crime to make false statements to FBI), which in many respects has more teeth perhaps even than the oath."). The defendants declined the court's offer.

**30.** The defendants objected to only three comments during the government's closing argument. Only one of the objections was sustained.

improper remark was when the government chided the defense for objecting too often under the rules of evidence. *See* Tr. at 9710–12. The court sustained the defendants' objection to this remark, so it caused little, if any, prejudice. The second improper remark was when the government implied the attorney defendants were guilty criminals. *See* Tr. at 9762. This remark may have caused Mr. McClatchey some prejudice, *see supra* part III.B, but it caused no prejudice to Mr. Anderson and the Drs. LaHue. The remainder of the alleged improper remarks at closing were merely proper invitations to the jury to draw inferences in the government's favor and do not represent prosecutorial misconduct. The court has also reviewed various prosecutorial indiscretions such as informing Mr. McGrath that the grand jury thought he was a "lying sack of shit" and threatening Mr. Probst to the effect that an attempt to shade his testimony in the defendants' favor would be met with the prosecutor figuratively shoving the documents "up your ass." In the final analysis, the court believes these remarks, although improper and certainly unbecoming for an Assistant United States Attorney, do not rise to the level of a due process violation. *See Chapman*, 615 F.2d at 1301 (slight excess of prosecution is not sufficient to entitle defendants to new trial). Neither of the witnesses appeared to have been intimidated in connection with their testimony and the jury was made aware of the prosecutor's comments for their consideration in evaluating that testimony.

## IV. Arrest of Judgment

 The defendants move for an arrest of judgment, arguing that the indictment does not state an offense. Pursuant to Fed.R.Crim.P. 34, arrest of judgment is appropriate "if the indictment or information does not charge an offense or if the court was without jurisdiction of the offense charged." A motion under the rule is limited to the record, including the indictment and verdict, but` excluding the evidence at trial. *United States v. Sisson*, 399 U.S. 267, 281–82, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970).

Defendants' motion for arrest of judgment does not set forth any new arguments. Instead, it "incorporates ... by ... reference the legal arguments set forth in ... prior motions, made prior to trial." In like fashion, the court denies the motion by referencing its carefully articulated pretrial rulings. *See United States v. Anderson*, No. 98–20030–01/–07–JWL, 1999 WL 79654 (D.Kan. Jan.19, 1999) (denying motion to dismiss indictment for duplicity, and denying motion to dismiss for failure to state an offense).[31]

## V. Production of Sentencing Memo

Although the defendants do not present the court with any authority directly on point, they make a persuasive argument that because the United States Probation Office ("USPO") is treated as an arm of the court, any communications by the government made to an officer of the USPO in connection with the preparation of a presentence investigation report ("PSIR") should be treated like communications to the court itself. In other words, if such communication is to be had, it should not be ex parte, but should be shared with the defendants.[32] The government argues in return that traditionally communications by both prosecution and defense are had with the USPO in this run-up to the preparation of a PSIR without any requirement to furnish copies of memos to the other side or to include representatives of adversaries in face to face meetings. This process has proven helpful to the USPO officers in discharging their responsibility to

---

**31.** The court does not readdress the defendants' vagueness as applied arguments because a motion under Rule 34 limits the court's consideration to only the indictment and verdict. *See Sisson*, 399 U.S. at 281–82, 90 S.Ct. 2117.

**32.** *See, e.g., United States v. Alverson*, 666 F.2d 341, 349 (9th Cir.1982) ("[I]t is improper for the prosecution to make, or for the court to receive from the prosecution, an ex parte communication bearing on the sentence.").

the court. The government also notes that if the logic of the defendants' argument is to be accepted it would, of course, be equally applicable to defendants who also routinely provide input for the preparation of the PSIR.

While the defendants' argument is facially appealing, the court is not persuaded that a blanket prohibition against ex parte contact with officers of the USPO is required by law. The role of the USPO is different from, say, that of the judge's law clerk to whom it would be improper to make an ex parte communication. The USPO receives narratives, suggestions, and even argument from both sides to assist it in preparation of the PSIR. Unlike a law clerk, whose advice to the judge is strictly confidential, however, the USPO officers assemble information and promulgate the PSIR for both informal and formal comment by both sides. The office furnishes this report with an addendum that sets out the reactions and objections of the parties, if any, to the proposed findings and recommendations. Crucially, then, ex parte conduct with the USPO officer has been a traditional and useful part of the investigative process but one which has as a check against impropriety the divulging of the PSIR to the parties with a mandated opportunity for them to present whatever contrasting views they may have to the court through objections, briefs and oral argument.

All that having been said, however, the court does believe that under certain circumstances there is the potential for unfair prejudice to a party as the process has worked. Judges may well accord certain tacit deference to the findings and recommendations of the USPO officers who regularly assist them in the often complex and sometimes befuddling regimen of sentencing under the United States Sentencing Guidelines ("USSG"). Thus, perceptions of the case, leading to proposed findings and recommendations of a USPO officer, if

sufficiently influenced by effective advocacy during the process of preparation of the PSIR, might be difficult to overcome—both on the part of the USPO officer during the objection and consultation phase after the initial draft of the PSIR has been furnished to counsel and by the side who must argue to the judge why a contrary view should be adopted at the sentencing hearing.

In order to resolve this problem, the court believes that it is appropriate to make some differentiation based upon the nature of the contact or submission of papers to the USPO. Routine provision of neutrally presented background facts concerning the parties' respective views of the offense conduct, for example, need not be subject to a stifling requirement of access for the opposing party. When a submission, particularly in writing, becomes blatantly an exercise in advocacy, however, fairness dictates that it be shared with the other side so that the danger of undue influence at the formative stages of this process can be tempered through adversarial scrutiny.[33] Advocacy, as contrasted with the even handed furnishing of information, occurs when, for example, specific recommendations are made about the selection of which guideline to apply (for that is sometimes a crucial threshold decision), what upward or downward adjustments should be made, or how the guidelines should be applied in light of the offense conduct or what might arguably be relevant conduct under the USSG. Advocacy also occurs when case law is presented to the USPO on a point or where argument is made in the submission in an attempt to persuade the USPO on a point. When a party has reasonable suspicion that an opposing party has engaged in advocacy in its ex parte dealings with the USPO, fairness dictates that the party have the opportunity to call this matter to the court's attention and at least ask for an

---

**33.** *See* D. Conn. R. 10 ("The attorney for the government may submit a 'Government's Version of the Offense' to the Probation Officer and, in that event, shall serve a copy on counsel for the defendant.").

in camera review by the judge to determine whether or not it would be appropriate to compel the side furnishing the alleged advocacy-oriented communication to the opposing side to alleviate the risk of attitudes being hardened at an early stage by a one sided flow of information.

The court has reviewed the government's submission here. It is an advocacy document. The government shall furnish copies of it to counsel for each of the defendants within five calendar days of the date the memorandum and order is filed. In the event the defendants wish to supplement their written submissions to the USPO in light of this document, they may do so within ten calendar days thereafter, with copies to counsel for the government.

IT IS THEREFORE ORDERED BY THE COURT that Dennis McClatchey's motion for acquittal or new trial (Doc. 428) is granted. The clerk will enter judgment of acquittal on all counts. Pursuant to Fed.R.Crim.P. 29(d), Mr. McClatchey is conditionally granted a new trial in the event the judgment of acquittal is hereafter vacated or reversed.

IT IS FURTHER ORDERED that Ronald LaHue's motion for acquittal (Doc. 426) is granted in part and denied in part. The clerk will enter judgment of acquittal on count eight. The motion is denied as to all other counts.

IT IS FURTHER ORDERED that the defendants' motion to compel production of the government sentencing memo (Doc. 420) is granted. The government shall furnish copies of it to counsel for each of the defendants within five calendar days of the date the memorandum and order is filed. In the event the defendants wish to supplement their written submissions to the USPO in light of this document, they may do so within ten calendar days thereafter, with copies to counsel for the government.

IT IS FURTHER ORDERED that Robert LaHue's motion for acquittal or new trial (Doc. 427), Dan Anderson's motion for acquittal, new trial, or arrest of judgment (Doc. 432), Ronald LaHue's mo-

tion for new trial (Doc. 425), and all defendants' motion to dismiss based on preindictment delay (Doc. 423) are denied.

IT IS SO ORDERED.